UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | : | |
| WILLIAM E. MIKE | : | |
|     Plaintiff, | : | |
| | : | Civil No. 3:03 CV 0539(DJS) |
|     v. | : | |
| | : | |
| SAFECO INSURANCE COMPANY | : | |
| OF AMERICA, | : | JULY 22, 2004 |
|     Defendant. | : | |
| | : | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56 of this District, Safeco Insurance Company of America ("Safeco") respectfully submits the following Memorandum of Law in support of its Motion for Summary Judgment. In his two count Complaint dated February 26, 2003, William Mike ("Plaintiff") alleges the following claims: 1) violation of the Connecticut Whistleblower Statute, Conn. Gen. Stat. § 31-51m; and 2) common law wrongful discharge based on the public policy against retaliating against individuals who in good faith complain of a violation of state statute.

Based on the undisputed evidence, Safeco is entitled to summary judgment as to the First Count because: 1) Plaintiff did not engage in protected activity by reporting a violation or suspected violation of law to the Connecticut Department of Labor ("DOL") as required by the Whistleblower Statute; and 2) it is undisputed that the decision-maker responsible for Plaintiff's discharge, Jeff LaFrance, was unaware of Plaintiff's alleged contacts with the DOL and, thus, cannot have retaliated against him on that basis. Safeco is entitled to summary judgment as to the Second

Count because Plaintiff's common law claim for wrongful discharge is statutorily precluded by his whistleblower claim in Count One and because there is no evidence that Plaintiff's discharge violated public policy.

As the following demonstrates, there is no genuine issue as to any material fact in this case and Safeco is entitled to judgment as a matter of law. Accordingly, Safeco's Motion for Summary Judgment should be granted and the Complaint should be dismissed.[1]

I.      FACTUAL BACKGROUND[2]

   A.      Plaintiff's Commencement Of Employment At Safeco

Plaintiff commenced employment at Safeco on or about April 3, 2000 as a Field Representative in the Claims Department.[3] (Pl. Dep. I, p. 28; Strange Aff., Ex. 1.)[4] As a Field Representative, Plaintiff was responsible for investigating and handling automobile damage claims in the field. Plaintiff "performed all aspects of auto damage claims . . . including . . . the photos, the documentation, the payments, the supplements, the phone calls, the problems." (Pl. Dep. I, p. 112.)

For the first two and a half months of his employment, Plaintiff attended training classes at Safeco's office in New Britain. Following his training, Plaintiff worked out of his house.

---

[1]   Relevant pages from deposition transcripts and other numbered exhibits referenced herein are appended to the Affidavit of Margaret J. Strange ("Strange Aff.") dated July 22, 2004, filed simultaneously herewith. Unpublished decisions cited herein are also attached to the Strange Affidavit. The Affidavit of Jeffrey LaFrance ("LaFrance Aff.") is also filed simultaneously herewith.

[2]   The following facts are presented only for purposes of this Motion. To the extent that Safeco accepts Plaintiff's allegations or testimony as true, it reserves the right to dispute those allegations or testimony should further litigation be necessary in this case or in any other matters.

[3]   A copy of Plaintiff's Offer Letter is attached to the Strange Affidavit as Exhibit 1.

[4]   The transcript of the first day of Plaintiff's deposition conducted on June 2, 2003 is referenced herein as "Pl. Dep. I, p. __." The transcript of the second day of Plaintiff's deposition conducted on February 4, 2004 is referenced herein as "Pl. Dep. II, p __." The transcripts of the deposition testimony of Fran Scalley and Jeff LaFrance are referenced herein as

(Pl. Dep. I, pp. 103-04.)   For approximately three to four months after completing his training, Plaintiff worked as a floater and handled claims state-wide.   Plaintiff was then assigned a geographical territory which consisted of the northeastern corner of the state. (Pl. Dep. I, pp. 28-29; LaFrance Dep., p. 48.)   Plaintiff worked with seven or eight other Field Representatives in Connecticut. (Pl. Dep., I, p. 109.)  Each Field Representative was responsible for handling claims in a different geographical territory.   (Pl. Dep. I, p. 24.)   At least two or three other Field Representatives had territories similar in size to Plaintiff's territory.   (LaFrance Dep., p. 48.)

When a claim was assigned to him, Plaintiff first contacted the claimant, drove to the vehicle, inspected the damage and took photographs of the damage.  (Pl. Dep. I, pp. 39-40; 53-54.) He then used his laptop computer with a software program called Pathways to prepare an estimate by calculating the cost of the parts, labor and other aspects of the repair job.  (Pl. Dep. I, p. 53.)

Plaintiff then negotiated the cost of repair with the shop owner and vehicle owner. (Pl. Dep. I, pp. 38-39.) This required Plaintiff to determine, for example, whether the part could be repaired, or whether it had to be replaced.  (Pl. Dep. I, pp. 63-64.)  If the part had to replaced, Plaintiff determined whether to use a brand new factory part, an aftermarket part or an LKQ, which is a used factory part.  (Pl. Dep. I, pp. 38-41, 62-63.)

Plaintiff had an authority level of $5,000 to reach the cost of repair with the shop owner and vehicle owner.   Any payment above his authority level had to be approved by his supervisor.   Plaintiff did not recall that his supervisor ever rejected paying a claim above his authority level. (Pl. Dep. I,  pp. 44-45.)

---

"Scalley Dep., p. __" and "LaFrance Dep., p. __."  Copies of the foregoing deposition transcripts are attached to the Strange Affidavit as Exhibits 12 through 15, respectively.

As part of his job duties, Plaintiff was responsible for finding hidden damage, analyzing when a claim included unrelated damage and for determining when a second inspection was required. (Pl. Dep. I, pp. 58, 78-79.) He was also responsible for determining if a car was repairable or if it was a total loss. (Pl. Dep. I, pp. 117-120.) During the last year to year and a half of his employment, Plaintiff also conducted scene investigations. (Pl. Dep. I, p. 122.) Plaintiff also had to determine if an appearance allowance was warranted or if he could apply a betterment to the claim. (Pl. Dep. I, pp. 65-66; 154-56.)

B.    Commencement Of Employment Of Fran Scalley

When he was first hired, Plaintiff reported to Mike McCullough. After about one year, Dave Kabera became the unit manager and Plaintiff's immediate supervisor. (Pl. Dep. I, pp. 162-63.) On March 20, 2002, Fran Scalley was hired as Product Line Manager at Safeco and became Mr. Kabera's supervisor. (Scalley Dep., pp. 7-8.) Once Mr. Scalley was hired, Plaintiff's job demands became more difficult. Before Mr. Scalley became Product Line Manager, Plaintiff's "job was to do my inspections as thoroughly and efficiently, as quickly as I can, pay as little as I can, and reduce the cost in that matter." (Pl. Dep. II, p. 49.) However, once Mr. Scalley was hired,

> The job became to include a lot more administrative-secretarial type work like that we had never done. He had us doing form letters, that I never sent out a letter in my life. And, unfortunately, all this stuff would have to be done by the time I leave my house, run around all day, get all the way back, do all my documentation and everything else that I would have to do, the over-and-above stuff.

(Pl. Dep. I, pp. 200-01.)

In July 2002, Mr. Scalley demoted Mr. Kabera to a Field Representative position and assumed Mr. Kabera's duties until a replacement could be found. In September 2002, Mr. Scalley, together with the human resources department, selected Jeff LaFrance to replace Mr. Kabera.

4

(Scalley Dep., pp. 8-9; Pl. Dep. I, pp. 200-01.)  From September 2002 until his termination on December 2, 2002, Plaintiff reported to Mr. LaFrance.  (LaFrance Dep., pp. 6-7; Scalley Dep., pp. 9, 60.)

        C.      Plaintiff's Performance Problems Under Mr. Scalley

While Mr. Scalley supervised Plaintiff between July 2002 and September 2002, he received several complaints about Plaintiff's communication style and his lack of professionalism. In one instance, a member of Safeco's human resources department complained to Mr. Scalley that Plaintiff had been hostile in processing a workers' compensation claim he submitted.  (Scalley Dep., pp. 26-27.)  Mr. Scalley also received a complaint from Chris Stagis, an inside unit manager, about the hostile manner in which Plaintiff communicated with an inside claims representative.  (Scalley Dep., pp. 27-29.)  These complaints involved Plaintiff yelling, exhibiting an inappropriate demeanor and generally demonstrating a lack of professionalism in his communications.  (Scalley Dep., p. 38.)

Mr. Scalley was also concerned about Plaintiff's job performance because Plaintiff worked "an enormous amount" of overtime which inflated the unit's costs and overall expenses. (Scalley Dep., p. 30.)  Plaintiff worked "a lot more" overtime than any other Field Representative. (Scalley Dep., pp. 34, 49.)  Mr. Scalley discussed Plaintiff's excessive overtime with him almost every day and was concerned because Plaintiff's production did not reflect the amount of overtime he worked.  (Scalley Dep., pp. 29-32.)  As Mr. Scalley testified,

> [W]hen a field examiner is out in the field inspecting a task, they're inspecting auto losses, scene investigations, you might run into some property [or] homeowner damage they might need to take a picture of.  There is a number of different types of tasks that one would do when they're out there. And the amount of production . . . I mean the task and the follow up to it really didn't constitute that much time involved.  And . . . we had many discussions on that.

(Scalley Dep., p. 32.) Plaintiff attempted to justify his excessive overtime on the grounds that he had a large territory which required a substantial amount of driving. (Scalley Dep., p. 49.)

D.    Plaintiff's Performance Problems Under Jeff LaFrance

In September 2002, Jeff LaFrance was hired as unit manager to replace Mr. Kabera and became Plaintiff's immediate supervisor. (LaFrance Dep., p. 6; Scalley Dep., p. 60.) As unit manager, Mr. LaFrance monitored the work of 12 or 13 Field Representatives, reviewed their written estimates, conducted re-inspections of their work and handled scheduling issues. (LaFrance Dep., pp. 7-8.) He also monitored how many claims were assigned to each individual and made sure that the claims were evenly distributed. (LaFrance Dep., p. 11.)

In evaluating Field Representatives under his supervision, Mr. LaFrance relied on the results of his re-inspections of their work, his file reviews and any complaints he received about them. (LaFrance Dep., p. 14.) Mr. LaFrance also considered the Field Representatives' efficiency in performing the requirements of the job. "[I]f they couldn't do their average amount of work in a regular time frame," then Mr. LaFrance took into account the amount of overtime a Field Representative worked. (LaFrance Dep., p. 17.)

Once he began reporting to Mr. LaFrance, Plaintiff's job duties continued to become more demanding. His duties changed in that,

> [t]hey became more definitive [and] started to include four tasks per day. So those are four new inspections. If I am someplace and have to go to do a secondary supplemental reinspection for hidden damage, I take the time to do it, but its not even recognized as time per Jeff and Fran because all they say is mileage and tasks. So there is a lot of work that is entailed to do a claim that they do not account for in their stipulations of those two parameters.

(Pl. Dep. II, pp. 49-50.) Plaintiff further testified, "The format of doing the estimates changed drastically and it involved basically a lot more work to do these estimates and a lot of that was

6

implemented since Jeff and Fran came on board. So in essence to actually do our job and complete a claim involved quite a bit more work afterwards than prior to them coming because some of these issues they initiated." (Pl. Dep. II, pp. 22-23.) Plaintiff concluded, "[A] lot of what Jeff and Fran did basically was in effect was increase the amount of work that it took to complete a claim." (Pl. Dep. II, p. 25.)

Plaintiff's performance problems, his lack of professionalism and his excessive use of overtime continued under Mr. LaFrance. For example, in reinspecting Plaintiff's work, Mr. LaFrance found,

> Physical re-inspections that would show writing parts that were not damaged, missing damage that was damaged, poor documentation on his estimates, meaning . . . not listing days to repair, not having the correct V-I-N number, vehicle identification number on the estimate, different items were missing or just not correct.

(LaFrance Dep., pp 18-19.) Mr. LaFrance also found a "higher percentage of deviances" in Plaintiff's estimates than in those prepared by other Field Representatives. (LaFrance Dep., p. 20.)

Mr. LaFrance also received several complaints about Plaintiff's job performance. (LaFrance Dep., p. 21.) The complaints concerned "[h]is demeanor on the job, not returning phone calls . . . on the estimates themselves, on the process he followed. So totaling the vehicle versus not totaling the vehicle – considering the vehicle totaled versus not totaling the vehicle without talking to the customer." (LaFrance Dep., p. 21.) In one instance, Plaintiff

> went out and inspected the vehicle, didn't get the VIN number correct on it, ended up totaling this gentleman's vehicle, considering it a total loss without contacting him, not knowing that the owner already had the parts for this vehicle to repair it – no communication whatsoever, so of course it escalates into a phone call that escalates into a formal complaint that comes into the company. We ended up repairing this gentleman's vehicle for him because it was more cost effective actually, after talking to him, to repair it than it was to total it.

7

(LaFrance Dep., p. 23.)  On another occasion, Mr. LaFrance received a complaint after Plaintiff

inspected a vehicle and prepared an estimate.  Mr. LaFrance testified,

> The claimant was not happy with his estimate.  Bill had already written a
> check for the damages.  The owner refused it and Mr. Mike proceeded to tear
> the check up in front of the guy, 'Fine, you don't want your check,' then tears
> it up in front of the guy and throws it away.  It's just unacceptable behavior,
> in front of a customer, to be doing something like that.

(LaFrance Dep., p. 24.) Mr. LaFrance discussed these issues with Plaintiff, but the more he talked to

him about his performance, "it seemed the worse it got."  (LaFrance Dep., p. 25.)

Plaintiff also exhibited a consistent inability to get his job done within normal

business hours.  Plaintiff "didn't do the work that . . . the average claim rep would do.  He got his 4

claims a day done but it involved excessive amounts of overtime."  (LaFrance Dep., p. 52.)  Mr.

LaFrance estimated that Plaintiff worked four times the amount of overtime than any other Field

Representative "to do the same amount of work."  (LaFrance Dep., p. 52.)

E.    Plaintiff's Performance Expectations, Action Plan And Termination Of Employment

In October 2002, Mr. LaFrance prepared a document outlining Plaintiff's performance

deficiencies and his expected improvement entitled "Performance Expectations."[5]  (LaFrance Dep.,

pp. 28-29.)  Mr. LaFrance "felt that there was a need for some kind of action with Mr. Mike, to get

him on the right track, to make him do his job the correct way."  (LaFrance Dep., p. 30.)

Before he prepared the document, Mr. LaFrance approached Mr. Scalley, who

directed him to contact human resources for assistance.  (LaFrance Dep., p. 29; Scalley Dep., pp. 64-

---

[5]  A copy of the document entitled "Performance Expectations" prepared by Mr. LaFrance is attached to the Strange
Affidavit as Exhibit 2.

65.) Mr. LaFrance then spoke to Ms. Kiernan, who assisted him in preparing the document. (LaFrance Dep., pp. 30-31.)

Mr. LaFrance met with Plaintiff on October 7, 2002 and discussed the items listed on the document. (Pl. Dep. II, pp. 17-18; Strange Aff., Ex. 2.) In the document, Mr. LaFrance outlined his concerns about Plaintiff's performance in five categories: 1) his failure to contact new assignments within 72 business hours; 2) his failure to properly document files after completing his inspections; 3) his failure to prepare complete and accurate estimates; 4) his failure to complete an average of four new tasks within normal work hours; and 5) his failure to show professional courtesy in dealing with co-workers and customers. (LaFrance Dep., pp. 31-43; Strange Aff., Ex. 2.) Plaintiff reviewed the document with Mr. LaFrance and made a copy for himself. (LaFrance Dep., p. 44.)

In late October 2002, after Plaintiff's performance failed to improve, Mr. LaFrance "went ahead and drew up an action plan, which was a 30-day plan."[6] (LaFrance Dep., p. 49.) Mr. LaFrance spoke to Ms. Kiernan and prepared the Action Plan with her assistance. He also notified Mr. Scalley that Plaintiff was being placed on an action plan because his performance had not improved. Ms. Scalley instructed Mr. LaFrance to work with human resources. (LaFrance Dep., pp. 49-50; Scalley Dep., p. 69.)

On October 30, 2002, Mr. LaFrance met with Plaintiff to discuss the issues outlined in the Action Plan. (LaFrance Dep., p. 49; Strange Aff., Ex. 3.) Mr. LaFrance expressed many of the same concerns regarding Plaintiff's failure to: 1) contact new assignments within 72 hours; 2) document his tasks including inspection delays, supplements and owner contacts; 3) follow procedure in preparing estimates; 4) complete an average of four new tasks per day within normal

---

[6] A copy of the Action Plan prepared by Mr. LaFrance is attached to the Strange Affidavit as Exhibit 3.

business hours; 4) follow company procedure by obtaining pre-approval for overtime; and 5) communicate with staff and customers in a professional manner. (LaFrance Dep., p. 49; Strange Aff., Ex. 3.) Mr. LaFrance explained to Plaintiff that he needed to improve in these areas and that if he failed to do so, it could lead to his discharge. (LaFrance Dep., pp. 50-51.) Plaintiff responded that he believed his job had changed, that the standards were difficult to achieve and that he would do his job to the best of his ability. (Pl. Dep. II, p. 85; LaFrance Dep., p. 51; Strange Aff., Ex. 3.) Plaintiff understood that if he did not improve his job performance, he could be terminated. (Pl. Dep. II, p. 86.) During the course of the meeting, Plaintiff became very upset, threw his notebook and took a chunk of wood out of Ms. Kiernan's desk. (LaFrance Dep., p. 51.)

After placing Plaintiff on the Action Plan, Mr. LaFrance continued to monitor his performance. Plaintiff "started documenting a little bit better but he was still argumentative as far as doing the job [and] always had a reason why he couldn't do the job." (LaFrance Dep., pp. 51-52.) His job performance did not improve in any other way. (LaFrance Dep., p. 53.)

Mr. LaFrance met with Plaintiff on November 25, 2002 to review his job performance and follow-up on the points outlined in the Action Plan. At the meeting, one of the items they discussed was Plaintiff's failure to use non-OEM parts on vehicles. When Mr. LaFrance "asked him why he would not, [Plaintiff] just stated, 'I can't waste my time. I'm just going to have to write supplements and I don't have time to write supplements.' So he just adamantly refused to do the job." (LaFrance Dep., p. 55.) During this meeting Mr. LaFrance believed that Plaintiff exhibited "a complete refusal to work with us, refusal to even try to improve on his part." (LaFrance Dep., p. 55.) Plaintiff also became quite loud and agitated during the meeting. He repeatedly called Mr. LaFrance a liar and told him he was full of shit. Plaintiff screamed and pounded on the desk so loudly that Ms.

Kiernan had to interrupt the meeting to ask him to quiet down because he was disturbing the rest of the office. (LaFrance Dep. p. 57.)

On December 2, 2002, after Plaintiff completed the thirty day period outlined in the Action Plan, Mr. LaFrance terminated his employment. On that date, Mr. LaFrance met with Plaintiff, reviewed the Action Plan and Plaintiff's deficient job performance, and notified him that he was discharged. (LaFrance Dep., pp. 55-58.) In documenting Plaintiff's discharge, Mr. LaFrance wrote, "Failure to follow or show improvement on 30 day action plan. . . . Refusal to follow company guidelines in writing estimates. Poor decision making. Poor communication. Poor professionalism."[7]

F.    Plaintiff's Alleged Contact With The Connecticut Department Of Labor

On July 31, 2002, prior to the hire of Mr. LaFrance, Mr. Scalley issued an email to Plaintiff and his co-workers in which he addressed the issue of whether commute time was compensable as part of the Field Representative's normal job duties.[8] There was some confusion regarding the issue and it was Mr. Scalley's understanding that Field Representatives' initial commute time from their house to their first assignment was not counted toward their usual work day for overtime purposes. (Scalley Dep., pp. 43-45.) Mr. Scalley invited anyone with any questions regarding his understanding of drive time to meet with him at his office on August 2, 2002. (Strange Aff,. Ex. 5; Scalley Dep., p. 46.)

Prior to August 2, 2002, Plaintiff contacted the Connecticut Department of Labor ("DOL") and "questioned" whether Field Representatives' initial drive time was compensable. (Pl

---

[7]  A copy of Plaintiff's termination paperwork is attached to the Strange Affidavit as Exhibit 4.

[8]  A copy of Mr. Scalley's email of July 31, 2002 is attached to the Strange Affidavit as Exhibit 5.

11

Dep. I, p. 15.) Plaintiff spoke to Peter Fracasso at the DOL, who informed him that Field Representatives' initial drive time was compensable and that such time counted toward their normal work hours. (Pl. Dep. I, pp. 13-16.)

In contacting the DOL, Plaintiff sought general information about the rules governing drive time. He did not file a complaint against Safeco with the DOL or any other agency. (Pl. Dep. I, pp. 16, 31.) In fact, the DOL does not have any record that Plaintiff contacted the agency or that Plaintiff spoke to Mr. Fracasso regarding his employment with Safeco.[9] (Strange Aff., Ex. 6.)

Plaintiff attended the meeting with Mr. Scalley on August 2, 2002. He was the only Field Representative who attended the meeting. Caryn Kiernan of Safeco's human resources department also attended the meeting. (Pl. Dep. I, pp. 17-19; Scalley Dep., p. 47.) At the meeting, Mr. Scalley reiterated his understanding that Field Representatives' initial drive time was not compensable. Plaintiff told Mr. Scalley and Ms. Kiernan that he had contacted the DOL and been informed that Field Representatives were entitled to compensation for such time. Plaintiff gave them Mr. Fracasso's name and phone number and asked them to further investigate the matter. (Pl. Dep. I, p. 18; Pl. Dep. II, pp. 78-80.) Plaintiff believed that Mr. Scalley and Ms. Kiernan were "receptive" to his comments. (Pl. Dep. I, p. 18.)

Shortly after his meeting with Plaintiff, Mr. Scalley learned, after further investigation by Ms. Kiernan, that Field Representatives' initial drive time was compensable. (Scalley Dep., pp. 54-55.) On August 6, 2002, Mr. Scalley issued an email to the Field Representatives in which he clarified that initial drive time was compensable and that "[y]our day begins when you leave the

---

[9] The Affidavit of Robin Starkel of the Department of Labor's Wage and Workplace Standards Division is attached to the Strange Affidavit as Exhibit 6.

house not as previously defined through my earlier conversations . . . . I apologize for the confusion this has created."[10] (Scalley Dep., pp. 55-56.) As a result, Safeco's policy of compensating Field Representatives' initial drive time never changed. (Pl. Dep. I, pp. 18-19; Pl. Dep. II, pp. 76-77.) Plaintiff was always compensated for his initial drive time. (Pl. Dep. I, pp. 205-06.)

G.   Mr. LaFrance Had No Knowledge Of Plaintiff's Alleged Contact With The Department Of Labor

At the time he terminated Plaintiff's employment, Mr. LaFrance had no knowledge of Plaintiff's alleged contact with the DOL in July 2002. (LaFrance Aff., ¶ 2.) Mr. Scalley never informed him that Plaintiff allegedly contacted the DOL to question Mr. Scalley's understanding of the compensability of Field Representatives' initial drive time. (LaFrance Aff., ¶ 3.) Nor did Ms. Kiernan ever inform Mr. LaFrance of Plaintiff's alleged contact with the DOL. (LaFrance Aff., ¶ 3.) Plaintiff never informed Mr. LaFrance of his discussions with the DOL "because it was an issue with me and Fran and Caryn." (Pl. Dep. II, pp. 77-78; LaFrance Aff., ¶ 3.) In fact, Mr. LaFrance was never even aware that there had been a question regarding the compensability of drive time for Field Representatives prior to Plaintiff's termination. (LaFrance Aff., ¶ 4.)

II.   LEGAL ANALYSIS

A.   Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; its requirement is that there be no <u>genuine</u> <u>issue</u> <u>of</u> <u>material</u> <u>fact</u>." <u>Anderson v.</u>

---

[10]   A copy of Mr. Scalley's email of August 6, 2002 is attached to the Strange Affidavit as Exhibit 7.

Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (citations omitted; emphasis in original). For purposes of summary judgment, a fact is "material" if it "might affect the outcome of the suit under the governing law." Id. at 248. An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-250. Once "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).

B.    Plaintiff Cannot Prevail On The First Count Alleging A Claim Under The Whistleblower Statute

In the First Count, Plaintiff alleges a claim under the Connecticut Whistleblower Statute, Conn. Gen. Stat. § 31-51m. The statute provides, in pertinent part,

> No employer shall discharge, discipline or otherwise penalize any employee because the employee . . . reports, verbally or in writing, a violation or a suspected violation of any state or federal law or regulation or any municipal ordinance or regulation to a public body, or because an employee is requested by a public body to participate in an investigation, hearing or inquiry held by that public body, or a court action.

Conn. Gen. Stat. § 31-51m(b).

14

General Statutes § 31-51m is a whistleblower statute designed to protect the rights of employees who complain of their employer's illegal activities to a public body. <u>Jordan v. Learning Clinic, Inc.</u>, CV 95 0051042, 1998 Conn. Super. LEXIS 1180, *4 (Conn. Super. Ct. Apr. 29, 1998) (attached to the Strange Aff. as Ex. 8) (noting that "the purpose of the statute is to protect legitimate reporting of violations by employers"). The statute "protects the employee from retaliatory discharge when the employee has complained, in good faith, about a suspected violation of state or federal law or regulation." <u>Arnone v. Town of Enfield</u>, 79 Conn. App. 501, 506-07 (2003).

Claims under Conn. Gen. Stat. § 31-51m are analyzed under the burden shifting framework first established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 802-04 (1973). <u>Arnone</u>, 79 Conn. App. at 507 (citing <u>LaFond v. General Physics Servs. Corp.</u>, 50 F.3d 165, 172 (2d Cir. 1995)). The Second Circuit described the burden shifting framework as follows:

> In an action under § 31-51m(b), the plaintiff would have the burden at the outset of proving by a preponderance of the evidence a prima facie case of retaliatory discharge as defined under the statute. Once the plaintiff has presented a prima facie case, the defendant would have the burden of articulating a legitimate, non-retaliatory reason for its action. If the defendant is able to articulate such a reason, the plaintiff would have an opportunity to show that the reason was merely a pretext for retaliation. The ultimate burden of persuading the trier of fact that the defendant violated § 31-51m(b) would remain at all times with the plaintiff.

<u>LaFond</u>, 50 F.3d at 172-73 (citations omitted); <u>see</u> <u>Arnone</u>, 79 Conn. App. at 507 (describing burden shifting framework).

In the present case, Plaintiff's claim under Conn. Gen. Stat. § 31-51m fails because: 1) he cannot establish a prima facie case of discrimination; and 2) there is no evidence that Safeco's legitimate, non-retaliatory reason for his termination was pretextual.

1.    Plaintiff Cannot Establish A Prima Facie Case Of Retaliation

To establish a prima facie case of retaliation under Conn. Gen. Stat. § 31-51m, Plaintiff must establish the following: 1) that he engaged in a protected activity; 2) that he was subsequently discharged from employment; and 3) that there was a causal connection between his participation in the protected activity and his discharge. Arnone, 79 Conn. App. at 507 (citations omitted). Plaintiff's prima facie case fails for two reasons: 1) there is no evidence that he reported a violation or suspected violation of law to the Department of Labor; and 2) there is no causal connection between Plaintiff's alleged contact with the DOL and his discharge because it is undisputed that the decision-maker responsible for Plaintiff's discharge, Jeff LaFrance, was not aware pf Plaintiff's alleged contacts with the DOL.

a.    Plaintiff Did Not Report A Violation Of Law To The Department Of Labor

The first prong of Plaintiff's prima facie case requires evidence that he engaged in protected activity as defined in Conn. Gen. Stat. § 31-51m(b). See Arnone, 79 Conn. App. at 507 (citations omitted). The first prong of Plaintiff's prima facie case fails because he did not "report a violation or suspected violation" of law to the DOL. Conn. Gen. Stat. § 31-51m(b).

General Statutes § 31-51m is designed to protect the rights of employees who complain of their employer's illegal activities. Arnone, 79 Conn. App. at 506-07; Jordan, 1998 Conn. Super. LEXIS at *4. Plaintiff's conduct in contacting the DOL to question Mr. Scalley's understanding of Safeco's drive time policy and to obtain information about the rules governing the compensability of drive time does not constitute protected activity within the meaning of the statute. As Plaintiff concedes, he contacted the DOL to question the agency about the rules governing the compensability of initial drive time. Plaintiff sought general information. He did not file a

16

complaint against Safeco and the DOL never commenced an investigation. (Pl. Dep. I, pp. 16, 31.) In fact, the DOL does not have any record that Plaintiff even contacted the agency or that he spoke to Mr. Fracasso regarding his employment with Safeco. (Strange Aff., Ex. 6.)

It is also undisputed that Mr. Scalley corrected his understanding that Field Representatives' initial drive time was not compensable and that Plaintiff was always compensated for his initial drive time. (Strange Aff., Ex. 7; Pl. Dep. I, pp. 18-19, 205-06; Pl. Dep. II, pp. 76-77.) Plaintiff cannot have reported a violation or suspected violation of law which never occurred because Mr. Scalley later corrected his mistaken understanding of the law. Accordingly, Plaintiff cannot establish the first prong of his prima facie case.

> b.  There Is No Casual Connection Between Plaintiff's Alleged Contact With The Department Of Labor And His Discharge Because Jeff LaFrance Was Not Aware That Plaintiff Allegedly Contacted The DOL

Under the third prong of his prima facie case under Conn. Gen. Stat. § 31-51m, Plaintiff must establish that there was a causal connection between his participation in the protected activity and his discharge. Arnone, 79 Conn. App. at 507 (citations omitted). The third prong of Plaintiff's prima facie case fails because it is undisputed that the decision-maker responsible for Plaintiff's discharge, Jeff LaFrance, was unaware of Plaintiff's alleged contacts with the DOL. Thus, Mr. LaFrance cannot have been motivated by Plaintiff's alleged protected activity in discharging him.

The decision-maker responsible for Plaintiff's discharge was Jeff LaFrance. (LaFrance Dep., pp. 55-56; LaFrance Aff., ¶ 2.) At the time he terminated Plaintiff's employment, Mr. LaFrance had no knowledge of Plaintiff's alleged contact with the DOL in July 2002 regarding Safeco's drive time policy. (LaFrance Aff., ¶ 2.) Mr. LaFrance was not hired until September 2002.

(LaFrance Dep., p. 6.) Mr. Scalley never informed him that Plaintiff allegedly contacted the DOL to question Mr. Scalley's understanding of the compensability of Field Representatives' initial drive time. (LaFrance Aff., ¶ 3.) Nor did Ms. Kiernan ever inform Mr. LaFrance of Plaintiff's alleged contact with the DOL. (LaFrance Aff., ¶ 3.) Plaintiff testified that he never informed Mr. LaFrance of his discussions with the DOL "because it was an issue with me and Fran and Caryn." (Pl. Dep. II, pp. 77-78; LaFrance Aff., ¶ 3.) In fact, Mr. LaFrance was never even aware that there had been a question regarding the compensability of drive time for Field Representatives prior to Plaintiff's discharge. (LaFrance Aff., ¶ 4.)

Consequently, it is undisputed that Mr. LaFrance did not know, at the time he discharged Plaintiff, that Plaintiff allegedly contacted the DOL about Mr. Scalley's understanding of the compensability of Field Representatives' initial drive time. Accordingly, Plaintiff cannot satisfy the third prong of his prima facie case and the complaint should be dismissed.

2.    Assuming That Plaintiff Established A Prima Facie Case, There Is No Evidence Of Pretext

Under the burden shifting framework, once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a non-retaliatory reason for the challenged adverse employment action. If the employer is able to articulate such a reason, the plaintiff has the opportunity to show that the reason was merely a pretext for retaliation. The ultimate burden of persuading the trier of fact that the defendant violated § 31-51m(b) remains at all times with the plaintiff. See Arnone, 79 Conn. App. at 507. In this case, the First Count should be dismissed because even assuming that Plaintiff established a prima facie case under Conn. Gen. Stat. § 31-51m, there is no evidence that Safeco's legitimate, non-retaliatory reason for Plaintiff's termination was a pretext.

18

Plaintiff was discharged for poor job performance as set forth in the Performance Expectations and the Action Plan prepared by Mr. LaFrance. (Strange Aff., Exs. 2, 3; LaFrance Dep., pp. 55-56.) Plaintiff's performance deficiencies were well-documented and he was given several opportunities to improve his performance prior to his discharge. There is no evidence that Mr. LaFrance's reasons for Plaintiff's termination were merely a pretext for retaliation.

In addition to the undisputed fact that Mr. LaFrance was never aware of Plaintiff's alleged contact with the DOL, there is simply no evidence that Plaintiff was discharged because he questioned Mr. Scalley's understanding of the compensability of Field Representatives' initial drive time in July 2002. Mr. Scalley did not supervise Plaintiff after Mr. LaFrance was hired in September 2002 and Mr. Scalley never met with Plaintiff to discuss his performance problems after that date. Mr. Scalley did not prepare the document entitled "Performance Expectations" and he was not present when Mr. LaFrance met with Plaintiff to review this document and discuss his concerns about Plaintiff's job performance. (Scalley Dep., pp. 64-65.) Mr. Scalley did not prepare Plaintiff's Action Plan and was not present for any discussions regarding this document. (Scalley Dep., pp. 68-69.) Finally, Mr. Scalley did not discharge Plaintiff and did not make the termination decision. (Scalley Dep., pp. 69-70; LaFrance Dep., pp. 55-56.) Thus, Plaintiff cannot establish that Mr. LaFrance's reason for Plaintiff's termination, poor performance, was a pretext for retaliation.

C.    Plaintiff Cannot Prevail On The Second Count Alleging A Common Law Claim For Wrongful Discharge

In the Second Count, Plaintiff alleges a common law claim for wrongful discharge based on the public policy "that employees who in good faith complain that their employers have violated state statutes should not be retaliated against." (Cmplt., Second Count, ¶ 20.) The Second

19

Count should be dismissed because: 1) it is statutorily precluded by Plaintiff's statutory remedy in the First Count; and 2) there is no evidence that Plaintiff's discharge violated public policy.

      1.    <u>Plaintiff's Wrongful Discharge Claim Is Statutorily Precluded By His Claim In Count One</u>

The general rule in Connecticut is that "contracts of permanent employment, or for an indefinite term, are terminable at will." <u>Coelho v. Posi-Seal Intl, Inc.</u>, 208 Conn. 106, 118 (1988). In <u>Sheets v. Teddy's Frosted Foods, Inc.</u>, 179 Conn. 471 (1980), the Connecticut Supreme Court recognized a common law tort of wrongful discharge as a narrow exception to the general rule of employment at will. The doctrine of wrongful discharge holds that an employer may be liable for discharging an employee only "if the former employee can prove a demonstrably improper reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." <u>Sheets</u>, 179 Conn. at 475.

Under the wrongful discharge exception to the rule of employment at will, "the employee has the burden of pleading and proving that his dismissal occurred for a reason violating public policy." <u>Morris v. Hartford Courant Co.</u>, 200 Conn. 676, 679 (1986). The Connecticut Supreme Court has reiterated its "adherence to the principle that the public policy exception to the general rule allowing unfettered termination of an at-will employee is a <u>narrow one</u>. . . . We are mindful that courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation." <u>Parsons v. United Technologies Corp.</u>, 243 Conn. 66, 76-77 (1997)(emphasis added).

The well-established rule in Connecticut is that a common law claim for wrongful discharge based on an alleged violation of public policy exists <u>only</u> where the plaintiff has no adequate statutory remedy. In <u>Atkins v. Bridgeport Hydraulic Co.</u>, 5 Conn. App. 643, 648 (1985),

the Appellate Court affirmed summary judgment for the defendant on the plaintiff's common law

claim for wrongful discharge on the grounds that the plaintiff already had meaningful statutory relief

available to him. The court stated,

> A finding that certain conduct contravenes public policy is not enough by
> itself to warrant the creation of a contract remedy for wrongful discharge by
> an employer. The cases which have established a tort or contract remedy for
> employees discharged for reasons violative of public policy have relied upon
> the fact that in the context of their case <u>the employee was otherwise without
> remedy and that permitting the discharge to go unredressed would leave a
> valuable social policy go unvindicated.</u>

<u>Atkins</u>, 5 Conn. App. at 648 (emphasis added)(citing <u>Wehr. v. Burroughs Corp.</u>, 438 F. Supp. 1052,

1054 (E.D. Pa. 1977)). In <u>Wehr</u>, the court reviewed the <u>Sheets</u> doctrine and the development of the

public policy exception to the general rule of employment at will and found,

> It is clear then the whole rationale undergirding the public policy exception
> [to employment at will] is the vindication or the protection of certain strong
> policies of the community. If these policies or goals are preserved by other
> remedies, then the public policy is sufficiently served. Therefore, <u>application
> of the public policy exception requires two factors: (1) that the discharge
> violates some well-established public policy; and (2) that there be no remedy
> to protect the interest of the aggrieved employee or society.</u>

<u>Wehr</u>, 438 F. Supp. at 1055 (emphasis added). <u>See Swihart v. Country Home Bakers, Inc.</u>, No. CV

97 060945, 1998 Conn. Super. LEXIS 3402, *12-*13 (Conn. Super. Ct. Dec. 3, 1998)("If there is a

statutory remedy already provided it cannot be said that permitting the discharge to go unredressed

would leave a valuable social policy . . . unvindicated.")(citing <u>Wehr</u>, 438 F. Supp. at 1054)(a copy

of which is attached to the Strange Affidavit as Exhibit 9). Thus, if an employee is able to enforce

the public policy concern at issue through an existing statutory remedy, there is no need for judicial

recognition of an independent common law cause of action. <u>Atkins</u>, 5 Conn. App. at 648.

In the present case, Plaintiff's wrongful discharge claim in Count Two is based on the same alleged misconduct by Safeco and the same public policy of protecting employees against retaliation as his claim in the First Count. Thus, as Plaintiff already has a statutory remedy under Conn. Gen. Stat. § 31-51m to vindicate the public policy alleged in the Second Count, his claim in the Second Count is statutorily precluded and should be dismissed. See Burnham v. Karl and Gelb, P.C., 252 Conn. 153, 158, 161-62 (2000)(finding that plaintiff's wrongful discharge claim was precluded by her remedy under Conn. Gen. Stat. § 31-51m); Esposito v. Connecticut College, No. X04 CV 970117504 S, 2000 Conn. Super. LEXIS 2305, *12-*13 (Conn. Super. Ct. Sept. 1, 2000) (dismissing wrongful discharge claim on grounds that Conn. Gen. Stat. § 31-51m provided statutory remedy for plaintiff's alleged whistleblowing activity)(attached to Strange Affidavit as Exhibit 10); Trombley v. Convalescent Center of Norwich, No. CV 543772, 1999 Conn. Super. LEXIS 1688, *9-*11 (Conn. Super. Ct. June 30, 1999)(finding that wrongful discharge claim for retaliatory termination was precluded by the statutory remedy provided in Conn. Gen. Stat. § 31-51m)(attached to Strange Affidavit as Exhibit 11).

In Campbell v. Town of Plymouth, 74 Conn. App. 67, 74 (2002), the Appellate Court affirmed the trial court's decision striking the plaintiff's public policy claim on the grounds that it was precluded by his statutory remedy in C.G.S. § 31-51m.[11] Relying on Burnham v. Karl and Gelb, the Appellate Court stated, "§31-51m provides the exclusive remedy for wrongful discharge for 'whistleblowing' and [] the availability of that statutory remedy precluded the plaintiff from pleading any alternative, common-law cause of action." Campbell, 74 Conn. App. at 74. The Appellate Court

---

[11]  The Appellate Court also affirmed the lower court's order of summary judgment dismissing the plaintiff's statutory whistleblower claim under C.G.S. § 31-51m for plaintiff's failure to comply with the statute's 90 day limitation period.

further stated, "Given the allegations before us and pursuant to <u>Burnham</u>, § 31-51m(c) provides the plaintiff's exclusive remedy for wrongful discharge." <u>Id.</u> at 75.

The Appellate Court also rejected the plaintiff's argument that, by striking his public policy claim, the trial court prohibited him from pleading his common law claim in the alternative. The Appellate Court held,

> In the present case, the plaintiff raises the public policy disfavoring discharge of employees who are "whistleblowers." That concern is addressed in § 31-51m, which creates a cause of action to protect such employees. Because the legislature has made a remedy available under that statute, the courts do not need to recognize a common-law exception to the at-will employment doctrine.

<u>Campbell</u>, 74 Conn. App. at 76 (emphasis added).

Based on the foregoing, Plaintiff's claim for wrongful discharge in the Second Count is precluded by his adequate statutory remedy under Conn. Gen. Stat. § 31-51m alleged in the First Count. Consequently, Safeco is entitled to summary judgment and the Second Count should be dismissed.

2.    <u>There Is No Evidence That Plaintiff's Discharge Violated Public Policy</u>

In the event the Court determines that Plaintiff's common law wrongful discharge claim in the Second Count is not statutorily precluded by his claim under Conn. Gen. Stat. § 31-51m in the First Count, Safeco is nonetheless entitled to summary judgment as to the Second Count because there is no evidence that Plaintiff's discharge violated the public policy against "that employees who in good faith complain that their employers have violated state statutes should not be retaliated against." (Cmplt., Second Count, ¶ 20.) For the reasons set forth in Sections II.B., above, there exists no question of material fact that Jeff LaFrance discharged Plaintiff in December 2002 for poor performance and not because Plaintiff allegedly contacted the DOL regarding Mr. Scalley's

23

understanding of the compensability of Field Representatives' initial drive time.  Accordingly,

Safeco is entitled to judgment as a matter of law and the Second Count should be dismissed.

III.     CONCLUSION

           For the foregoing reasons, Safeco's Motion for Summary Judgment should be

granted.


                              THE DEFENDANT,
                              SAFECO INSURANCE COMPANY
                              OF AMERICA


           By:      _Margaret J. Strange_____

                    Margaret J. Strange (ct 08212)
                    James F. Shea (ct 16750)
                    Jackson Lewis LLP
                    55 Farmington Avenue, Suite 1200
                    Hartford, CT  06105
                    (860) 522-0404
                    email: strangem@jacksonlewis.com
                    email: sheaj@jacksonlewis.com

CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing was sent by first class mail, postage prepaid, this 22nd day of July 2004 to the following counsel of record:

Anthony J. Pantuso, III
Hayber & Pantuso, LLC
221 Main Street, Suite 400
Hartford, CT  06106

_Margaret J. Strange_
Margaret J. Strange

H:\Client Folder\S\Safeco\MIKE2\Pld\MSJ\Motion for Summary Judgment.doc
65692