## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____
:
**WILLIAM E. MIKE**               :          **CIVIL ACTION NO.**
          **Plaintiff**               :
:
:
**v.**                               :          **3: 03 CV 539 (DJS)**
:
:
**SAFECO INSURANCE COMPANY**     :
**OF AMERICA**                    :
          **Defendant**               :          **October 1, 2004**
_____:

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

**I.       INTRODUCTION**

Plaintiff, through his undersigned counsel, hereby opposes Defendant's Motion for

Summary Judgment, dated July 22, 2004.  Plaintiff has established a prima facie case that, by

changing the conditions of his employment so as to set him up for failure, Defendant retaliated

against him in violation of Connecticut's Whistle Blower statute, Connecticut General Statutes

Section 31-51m, and in violation of the public policy of the State of Connecticut.  Furthermore,

there are genuine issues of material fact as to the defenses asserted by Defendant.

**II.      FACTUAL BACKGROUND**

From April, 2000 until December, 2002, Plaintiff, William Mike, worked as a Claims

Field Representative – Physical Damage (PD) Rep[1] ("PD Rep") for the Defendant, Safeco

Insurance Company of America ("Safeco").  See Affidavit of William E. Mike, attached as

_____

[1]Safeco's nomenclature for the position has not been consistent.  At various times,
Plaintiff has been referred to as "Field Representative Auto," "Claims Field Representative" and
"Claim Representative."  See, e.g., Performance Reviews, attached as Exhibits B, C and D.

Exhibit A, at ¶ 4.  Plaintiff's primary responsibilities were to inspect and appraise damaged automobiles.  *Id.* at ¶ 5.  He performed his job well and was never disciplined, received any written or verbal warnings, or put on any type of corrective action plan from the beginning of his employment until October 2002.  *Id.* at ¶ 6.  He received favorable performance reviews prior to August 2, 2002, and specifically was commended for going out of his way to better serve Safeco's customers and taking the time to do proper claim research.  *Id.* at ¶ 7; see also Performance Reviews, Exhibits B (4/19/2002) at 2; Exhibit C (11/1/2001) and D (1/8/2001).

PD Reps such as Plaintiff were evaluated by Safeco on, *inter alia*, such "hard numbers" as percentage of Original Equipment Manufacturer (OEM) parts versus non-OEM parts, repair versus replace percentage, turnaround time, claims volume and estimate overwrite.  See Deposition of Jeffrey LaFrance, relevant portions of which are attached as Exhibit E, at 14-15.  Prior to August, 2002, Plaintiff's "hard numbers" were quite good and exceeded expectations.  For example, in his Performance Review of April 19, 2002 his estimate overwrite was 2.3%, compared to a target of 4.5% or less, and his OEM vs. non-OEM parts usage was 25.76% compared to a target of 24% or greater.  Exhibit B.  He also exceeded his objectives for customer service turn-around.  *Id.*  This Performance Review also rated Plaintiff as "skilled" in his job proficiency.  *Id.*

Plaintiff was responsible for a very large territory, that covered roughly the north-eastern quarter of the state, east from West Hartford to the Rhode Island border and north from Glastonbury to Thompson, on the Massachusetts border.  Exhibit A at ¶ 9.  His territory was larger than that covered by any of his fellow PD Reps and the size of his territory increased during his tenure with Safeco.  *Id.* at ¶ 10.  As a result of the large size and rural character of his

territory, Plaintiff usually drove between 120 and 160 miles per day, and spent at least 3 hours of his 7.75 hour work-day driving.  *Id.* at ¶ 11.  Also as a result of the large size of Plaintiff's territory, he averaged between 1500 and 2000 minutes per month on his business cell phone, substantially more than the minutes used by his fellow PD Reps.  *Id.* at ¶ 12.  The nature of his territory required him to do more work than other PD Reps.  See Deposition of Plaintiff (June 3, 2003), relevant portions of which are attached as Exhibit F, at 27.  In order to meet Safeco's requirement that he inspect all vehicles within three days of receiving the assignment, as well as perform the multiple supplements, re-inspections and documentation required by his position, Plaintiff regularly worked more than Safeco's standard 38.75 hour week.  Exhibit A at ¶ 13. Prior to July 16, 2001, PD Reps were classified as "Exempt" employees who were not paid overtime, and Safeco did not keep records of the amount of overtime worked by PD Reps.  *Id.* at ¶ 14.  In the 12 month period following the reclassification and prior to August 2, 2002, however, Plaintiff worked an average of 14.60 hours of overtime per bi-monthly pay period.[2]  *Id.* at ¶ 15; see also Paystubs, attached as Exhibit G.

    Francis Scalley was hired by Safeco in March 2002 as Product Line Manager.  See Deposition of Francis Scalley, relevant portions of which are attached as Exhibit H, at 7.  In that position, he was responsible for managing inside examiners, outside examiners and commercial examiners, for both auto and home lines.  *Id.*  Prior to July, 2002, requests for overtime by automobile appraisers such as Plaintiff were submitted for approval to David Kabara, Plaintiff's Unit Manager and direct supervisor.  *Id.* at 14-15.  Prior to August 2, 2002, overtime was not a

---

[2]This average does not include the period when Plaintiff was out of work due to an injury, and thus receiving Workers' Compensation benefits.

major concern.  Exhibit A, ¶ 18.  In July 2002, Mr. Scalley assumed the responsibilities of Mr.

Kabara, who was moved to another position.  Exhibit H at 8-9.  Scalley directly supervised PD

Reps, including Plaintiff, for the months of July and August, 2002.  *Id.* at 9.  During this time

period, Scalley did not have any complaints with Plaintiff's job performance.  *Id.* at 29.  Scalley

earlier had reviewed and signed Plaintiff's favorable Performance Review.  See Exhibit B at 7.

Scalley testified at his deposition that he could not recall having any complaints or concerns

about (1) the accuracy of Plaintiff's appraisals; (2) the completeness of his appraisals; (3) how

long it took Plaintiff to perform new tasks; (4) Plaintiff's file documentation; (5) writing non-

visible damage in his estimates; (6) paying questionable items; or (7) in the number of tasks

being completed by Plaintiff in a given day.  Exhibit H at 31-32, 65-68.  He also testified that the

amount of overtime that Plaintiff was working was not a concern:

> Q.     And how about the concerns about the amount of time he was putting in?
>
> A.     Yeah, he was putting in more time than everybody else sure, but that wasn't a
>        concern of mine.

Exhibit H at 34.

On Wednesday, July 31, 2002, Mr. Scalley issued an email to Plaintiff and his co-

workers stating that they would no longer be paid for their first commute of the day, despite the

fact that they were automobile appraisers who were working out of their homes.  Exhibit A at ¶¶

19; see also e-mail, July 31, 2002, attached as Exhibit I.  Plaintiff called the Connecticut

Department of Labor that same day to report this new policy, because he believed that it was

illegal.  Exhibit A at ¶¶ 20-21; see also contemporaneous notes of Plaintiff, attached as Exhibit J.

Plaintiff spoke with Mr. Peter Fracasso, an investigator in the Wage and Hour division of the

Connecticut Department of Labor, informed him that Safeco was about to institute a policy that

he and his fellow automobile appraisers would not be paid for the first drive of the day, and asked Mr. Fracasso if the proposed change in policy was illegal.  Exhibit A at ¶ 22; see also Exhibit F at 14-16.  Mr. Fracasso told Plaintiff that this proposed policy was illegal.  Exhibit A at ¶ 23; Exhibit F at 14-16.

On Friday, August 2, 2002, Plaintiff attended a meeting that Mr. Scalley had arranged to discuss his new "drive time" policy.  Exhibit A at ¶ 24; see also Exhibit H at 46-47; Exhibit I; Exhibit J.  Plaintiff was the only automobile appraiser to attend that meeting.  Exhibit A at ¶ 25; Exhibit H at 47.  At this meeting, Plaintiff informed Scalley that he had called the Department of Labor to report the contemplated change in the "drive time" policy and had been informed that the proposed policy was illegal, and that state law required Safeco to pay automobile appraisers for their first drive of the day.  Exhibit A at ¶ 26; Exhibit H at 48-49.  The following Tuesday, as a direct result of Plaintiff's informing Mr. Scalley of his report to the Department of Labor, Scalley abandoned his plan to implement this illegal policy.  Exhibit A at ¶ 27; see also e-mail correspondence, 8/6/2002, attached as Exhibit K.

Following this meeting, Scalley's treatment of Plaintiff changed dramatically.  Exhibit A at ¶ 28; Exhibit F at 20-27.  Suddenly, Plaintiff "could not do anything right as far as performing my job."  Exhibit F at 20.  After Plaintiff informed Scalley that he had contacted the Department of Labor, Scalley instructed Plaintiff to stop working overtime, even though Plaintiff customarily was required to work overtime because of the large size of his territory.  Exhibit A at ¶ 29.  On August 16, 2002, Scalley had a meeting with Plaintiff and Caryn Kiernan from Safeco's Human Resources Department, at which Scalley criticized Plaintiff's job performance.  Exhibit A at ¶ 30.  On that date, Scalley placed a memorandum in Plaintiff's personnel file criticizing him for

"spen[ding] too much time on incidental tasks . . . [and t]oo much time on (the) computer."  See

Memorandum, 8/16/2002, attached as Exhibit L.  This memorandum also criticized Plaintiff's

professionalism and communications, areas for which he previously had been commended.  See

Exhibit B at 3 ("Bill continues to show development in dealing with customers and shops,

including professionalism, patience, sensitivity and tact in claim handling."); Exhibit C at 3

(same).  Besides finding fault with Plaintiff's job performance, where none had been found

before, Scalley also increased pressure on Plaintiff about the amount of his overtime, and began

refusing to authorize Plaintiff's requests for overtime, although such requests routinely had been

authorized in the past to allow Plaintiff to properly cover his large territory.  Exhibit A at ¶ 31;

see also e-mail correspondence, attached as Exhibit M.  After August 2, 2002, Plaintiff averaged

only 7.0 hours of overtime per bi-monthly pay period.  Exhibit A at ¶ 32; see also Exhibit G.

Thus, after Plaintiff informed Scalley of his report to the Department of Labor, and after Scalley

was forced to retract his new, illegal "drive time" policy, Scalley set him up for failure by

insisting that he perform a 50 hour per week job in 38.75 hours.

Within approximately one month, Scalley put Plaintiff under the direct supervision of

Jeffrey LaFrance.  Exhibit A at ¶ 33.  LaFrance previously had worked with Scalley at GEICO,

and had been recruited for the position at Safeco by Scalley.  Exhibit E at 10.  Almost

immediately, while under the direct supervision of Scalley, LaFrance began to criticize

Plaintiff's performance.  Exhibit A at ¶ 34.  Although Plaintiff repeatedly complained to both

Scalley and LaFrance that their treatment of him was unfair and different from their treatment of

his co-workers, they ignored his complaints.  *Id.* at ¶ 35.  Although Plaintiff repeatedly

complained to both Scalley and LaFrance that they were not authorizing the overtime necessary

to perform his job as he had prior to the August 2, 2002 meeting, Scalley and LaFrance increased their pressure on Plaintiff to meet their unreasonable and unrealistic expectations within a shortened work day.  *Id.* at ¶ 36; Exhibit F at 90-91.

In order to see exactly how Plaintiff was performing his job, Mr. LaFrance took the opportunity to "ride along" with Plaintiff.  Exhibit A at ¶ 37; see also Exhibit E at 27-28; Exhibit F at 29-30.  LaFrance found nothing deficient in Plaintiff's performance.  Exhibit A at ¶ 37; see also Exhibit E at 27-28; Exhibit F at 29-30.  Mr. LaFrance had no suggestions or constructive criticism as to how Plaintiff could improve his efficiency or improve the quality of his inspections and estimates.  Exhibit A at ¶ 38; see also Exhibit E at 27-28; Exhibit F at 30. Rather, LaFrance told Plaintiff to "just keep doing what you're doing," and specifically commended Plaintiff on his telephone technique, manners and etiquette.  Exhibit A at ¶ 39; Exhibit F at 29-30.

As an inevitable result of the pressure being put on Plaintiff to perform an approximately 50 hour job in 38.75 hours, his job performance began to suffer.  Exhibit A at ¶ 40.  Plaintiff no longer was permitted the time required to provide superior customer service, even though he repeatedly informed both Mr. Scalley and Mr. LaFrance that good customer service takes time. *Id.* at ¶ 41.  On October 7, 2002, LaFrance, in consultation with Scalley, wrote out a document entitled "Performance Expectations" (a copy of which is attached as Exhibit N) which set forth contradictory and unreachable expectations.  Exhibit N; see also Exhibit H at 64-65; Exhibit A at ¶ 42.  Specifically, Plaintiff was required to "complete [an] average of 4 new tasks per day within standard hours, [including] supplements and documentation."  Exhibit N; Exhibit A at ¶ 43.  Supplements, reinspections and documentation were not counted by LaFrance and Scalley as

"new tasks" performed per day, although these activities took substantial time, often requiring Plaintiff to spend hours driving through his territory to meet with owners and/or repair shops and reinspect vehicles.  Exhibit A at ¶ 44.  Further, because Safeco's policy was not to pay for damage that could not be seen on the initial inspection, Plaintiff regularly was required to reinspect vehicles and issue supplements. *Id.* at ¶ 45.  In addition, Plaintiff repeatedly informed LaFrance that providing good customer service was something that took time, and could not be measured solely on how many "new tasks" were performed.  *Id.* at ¶ 46.  Mr. LaFrance's response to this was that he would simply "add this to your action plan."  *Id.* at ¶ 47.  On October 28, 2002, LaFrance, again in consultation with Scalley, placed Plaintiff on an "Action Plan" (a copy of which is attached as  Exhibit O).  See Exhibit E at 49-50; Exhibit H at 69-70.  This "Action Plan" expanded upon the contradictory and unreachable expectations:

> Task performance – An average 7.75 hour day should consist of 4 new tasks completed with an average of 120 miles driven.  This day should also encompass the remainder of the job duties that include but are not limited to – documentation of files, file reviews, phone calls, payments, supplemental inspections, e-mail reviews.  All task (sic) should be contacted before inspection to confirm vehicle is located at assigned location.

Exhibit O.

Following the issuance of this "Action Plan," Plaintiff was subjected to contradictory instructions from LaFrance and Scalley that prevented him from achieving the goals set forth in the "Action Plan."  Exhibit A at ¶ 51.  For example, although the "Action Plan" required Plaintiff to perform all file documentation and file reviews daily, both Scalley and LaFrance at various times during the months of October and November, 2002 first instructed Plaintiff not to perform these tasks, and then criticized him for not doing them.  Exhibit A at ¶ 52.  This "Action Plan" also increased the expected number of miles driven per day from the previous standard of 100 to

120.  Compare "Action Plan," Exhibit O, with e-mail, 10/7/2002, attached as Exhibit P; see also Exhibit A at ¶ 53.  None of Plaintiff's co-workers were subjected to such an "Action Plan" or expected to meet such criteria while handling such a large territory.  Exhibit A at ¶ 54.

On December 2, 2002, LaFrance, in consultation with Scalley and Human Resources, terminated Plaintiff's employment.  Exhibit E at 55-56; Exhibit H at 70-71.  The stated reason was Plaintiff's inability to meet the contradictory and unreachable expectations set for him by Scalley and LaFrance.  Exhibit A at ¶ 56.

## III.    STANDARD OF REVIEW

### A.    General Summary Judgment Standard

A party moving for summary judgment has the burden of demonstrating the absence of a genuine issue of material fact.  Fed.R.Civ.P. 56(c); *see* ***Adickes v. Kress & Co.***, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); ***United States v. One Tintoretto Painting***, 691 F.2d 603, 606 (2d Cir.1982); ***United States v. Pent-R-Books, Inc.***, 538 F.2d 519, 529 (2d Cir.1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977).  The duty of the court is to determine whether there are issues to be tried; in making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion.  See, e.g., ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); ***United States v. Diebold, Inc.***, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); ***Balderman v. United States Veterans Administration***, 870 F.2d 57, 60 (2d Cir.1989); ***Rodriguez v. City of New York***, 72 F.3d 1051, 1061 (2d Cir. 1995),  If, as to the issue on which summary judgment is

sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper.  See, e.g., **Brady v. Town of Colchester**, 863 F.2d 205, 210-11 (2d Cir.1988).

    B.    *Standard of Review for "Whistle-blower" Claims Under Connecticut General Statutes Section 31-51m*

The burden-shifting framework first established in **McDonnell Douglas Corp. v. Green**, 411 U.S. 792, 802-804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) is to be applied to "whistle-blower" claims for retaliatory discharge under Connecticut General Statutes Section 31-51m.  **Arnone v. Town of Enfield**, 79 Conn. App. 501, 507 (2003).  "In an action under § 31-51m(b), [the] plaintiff has the initial burden under **McDonnell Douglas Corp**. . . . of proving by a preponderance of the evidence a prima facie case of retaliatory discharge. . . .  This consists of three elements:  (1) that [the plaintiff] engaged in a protected activity as defined by § 31-51m (b);  (2) that [the plaintiff] was subsequently discharged from his employment;  and (3) that there was a causal connection between his participation in the protected activity and his discharge." *Id.*, citing **Ritz v. East Hartford**, 110 F. Supp.2d 94, 98 (D.Conn.2000) and **Beizer v. Dept. of Labor**, 56 Conn. App. 347, 355-56, cert. denied, 252 Conn. 937, 747 A.2d 1 (2000).  Once the plaintiff has made a prima facie showing of a retaliatory discharge, the burden shifts to the defendant to produce evidence that, if taken as true, would permit the conclusion that there was a non-retaliatory reason for the termination of employment.  **Arnone**, 79 Conn. App. at 507.  If the defendant provides a legitimate and non-retaliatory reason for the discharge, the burden shifts back to the plaintiff to offer some significantly probative evidence showing that the defendant's proffered reason is pretextual and that a retaliatory intention resulted in his discharge.  *Id.*; see also **Beizer v. Dept. of Labor**, 56 Conn. App. at 356.

C.      *Summary Judgment in Employment Discrimination Cases*

Summary judgment dismissing an employment discrimination case is warranted only where a plaintiff cannot provide evidence to support an essential element of his claim. See ***Schnabel v. Abramson***, 232 F.3d 83 (2d Cir.2000); ***Quinn v. Green Tree Credit Corp.***, 159 F.3d 759, 764 (2d Cir.1998). Summary judgment is inappropriate when "questions concerning the employer's motive predominate the inquiry." ***Morris v. Lindau***, 196 F.3d 102, 110 (2d Cir.1999). Thus, where, as here, a plaintiff claims he is the victim of unlawful discrimination or retaliation, an award of summary judgment ordinarily is inappropriate. ***Rosen v. Thornburgh***, 928 F.2d 528, 533 (2d Cir.1991). As the Second Circuit has recognized, "employment discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence. An employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory or retaliatory intent. ***Hollander v. American Cyanamid Co.***, 895 F.2d 80, 85 (2d Cir.1990); ***Dister v. Continental Group, Inc.***, 859 F.2d 1108, 1112 (2d Cir.1988). A victim of discrimination therefore seldom can prove his claim by direct evidence, and usually must rely on the cumulative weight of circumstantial evidence." ***Rosen v. Thornburgh***, 928 F.2d at 533. Thus, the burden that an employment discrimination plaintiff must meet in order to defeat summary judgment at the *prima facie stage* is *de minimis*. ***McClee v. Chrysler Corporation***, 109 F.3d 130, 134 (2d Cir.1997); see also ***De La Cruz v. New York Human Resources Administration Dept. of Social Services***, 82 F.3d 16, 20 (2d Cir.1996).

IV.    **DISCUSSION**

A.      *Plaintiff's Contact With the Connecticut Department of Labor is Protected
           Activity Under Connecticut General Statute Section 31-51m*

Defendant first argues that Plaintiff cannot meet his minimal burden to oppose summary judgment because his contacts with the Connecticut Department of Labor were not "protected activity" under Connecticut General Statute Section 31-51m. Defendant asserts, with no authority, that Plaintiff must have filed a formal complaint that resulted in a formal investigation. See Defendant's Memorandum of Law at 16-17. Defendant takes an overly restrictive and niggardly view of what constitutes such "protected activity" that is not supported by Connecticut case law.

Section 31-51m is a remedial statute that should be read broadly in favor of those employees whom it is intended to protect. *Dysart Corp. v. Seaboard Surety Co.*, 240 Conn. 10, 18 (1997). The statute provides, in relevant part:

> No employer shall discharge . . . any employee because the employee, or a person acting on behalf of an employee, reports, verbally or in writing, a violation or a suspected violation of any state or federal law or regulation . . . to a public body.

Under the express terms of the statute, an employee who verbally reports a suspected violation of a state law or regulation is engaged in protected activity. Nowhere does the statute require that the report take the form of a formal complaint, or that the report result in a formal investigation.

This broad view of what constitutes "protected activity" is supported by Connecticut case law. For example, in *Hankard v. Town of Avon*, 2000 WL 1207312 (Conn. Super., August 1, 2000) (copy attached as Exhibit Q) the court noted that a plaintiff need not even report an *actual* violation of the law to fall within its protections:

> The plaintiffs' suspicion that the defendants' behavior was unlawful was, as it turns out, incorrect. . . . This does not, however, negate their claim, if those suspicions were made in good faith and a reasonable person under the same or

12

similar circumstances would have harbored the same suspicions about Martino's orders. See e.g. *LaFond v. General Physics Services Corp.*, 50 F.3d 165 (2d Cir.1995); *Sullivan v. Massachusetts Mutual Life Ins. Co.*, 802 F .Sup. 716 (D.Conn.1992). Permitting an agency to punish an employee for "blowing the whistle" just because the reported violation turns out to be wrong would have a chilling effect on prospective whistle blowers and negate the purpose of the statute.

Plaintiff has submitted evidence to show that he contacted the Connecticut Department of Labor on July 31, 2002, that he spoke with Peter Fracasso, an investigator in the Department of Labor's Wage and Hours division, that he reported to Mr. Fracasso that Safeco intended to implement a new policy regarding drive time, and that he thought this new policy might be illegal. See Exhibit A at ¶¶ 20-22. Mr. Fracasso confirmed that the proposed new policy was, in fact, illegal. *Id.* at ¶ 23; see also Exhibit F at 14-16. This clearly is "protected activity" under the statute, and no formal complaint or formal investigation was required.

Indeed, the reason that there was no formal complaint and no formal investigation is that, because of Plaintiff's report to the Department of Labor, the illegal policy never was implemented. Safeco, however, would have this Court graft a requirement of a formal complaint and formal investigation onto the statute. This would create the anomalous situation in which Plaintiff, who prevented an illegal policy from being implemented, is afforded less protection under Section 31-51m than would be a less successful whistle-blower

Because Plaintiff has submitted sufficient evidence from which a trier of fact can conclude that he engaged in protected activity, Defendant's Motion for Summary Judgment should be denied.

     B.     *There are Material Questions of Fact Regarding Whether Plaintiff's Termination was Caused by his Report to the Department of Labor*

Defendant next argues that Summary Judgment is appropriate because there was no causal connection between Plaintiff's protected activity and his termination. Specifically, Defendant argues that because LaFrance allegedly was unaware of Plaintiff's report to the Department of Labor, it could not have played a role in the decision to terminate him. In fact, Plaintiff has presented sufficient evidence from which a trier of fact may conclude that Scalley and LaFrance, acting together, set Plaintiff up for failure in order to retaliate against him for having prevented Scalley from implementing the illegal "drive time" policy.

Such evidence may be summarized as follows: Prior to August 2, 2002, Plaintiff was a good employee who had been commended for his customer service, professionalism and willingness to take the time to do a good job. (See Exhibit A, ¶¶ 6-8 and Performance Reviews, Exhibits B, C and D). Before July 16, 2001, there never was an issue over the amount of time it took Plaintiff to perform his job, since he was classified as "Exempt" and not paid overtime. (See Exhibit A at ¶ 14). Between the reclassification to "Non-Exempt" on July 16, 2001 and the meeting of August 2, 2002, Plaintiff routinely was permitted to work the overtime necessary to cover his unusually large territory. (See Exhibit A, ¶¶ 9-15; Exhibit G). Prior to August 2, 2002, Scalley did not have any complaints about Plaintiff's job performance. (See Exhibit H at 29, 65-68).

Immediately after August 2, 2002, the date on which Plaintiff informed Scalley that he had reported the proposed new policy to the Department of Labor and learned that it was illegal, Scalley began to retaliate against him. He instructed Plaintiff not to work the overtime necessary to cover his abnormally large territory. (See Exhibit A, ¶ 29). He began to criticize Plaintiff's job performance, placing a memorandum in Plaintiff's personnel file criticizing him in areas for

14

which he previously had been commended. (Compare Exhibit L with Exhibits B and C).  He

began to refuse to authorize Plaintiff's overtime requests, which routinely had been approved in

the past.  (See Exhibit A, ¶¶ 31-32; Exhibit M).

      One month later, Scalley recruited LaFrance, a former co-worker at GEICO, and installed

him as Plaintiff's immediate supervisor.  (See Exhibit E at 10).  Contrary to the observations of

Plaintiff's prior supervisors (including Scalley before the August 2, 2002 meeting), LaFrance

immediately began to find fault with Plaintiff's job performance. (See Exhibit A, ¶¶ 34-36).

When given the opportunity to ride along with Plaintiff and observe him, however, LaFrance

could not identify one single thing that Plaintiff was doing wrong.  (See Exhibit E at 27-28;

Exhibit A, ¶¶ 37-39; Exhibit F at 29-30).  LaFrance, in consultation with Scalley, "wrote up"

Plaintiff twice in October, 2002, while continuing to pressure him to perform a 50 hour job in

38.75 hours.  (See Exhibit A, ¶¶ 41-50; Exhibit E at 49-50; Exhibit H at 64-65, 69-70; Exhibit N;

Exhibit O).  Both Scalley and LaFrance subjected Plaintiff to changing and unrealistic standards,

to which none of Plaintiff's co-workers were held.  (See Exhibit A, ¶¶ 50-54; Exhibit O; Exhibit

P).  Ultimately, in consultation with Scalley, LaFrance fired Plaintiff.  (See Exhibit E at 55-56;

Exhibit H at 70-71).

      The trier of fact, after hearing such evidence, may conclude that the change in Plaintiff's

treatment after August 2, 2002 was caused by Scalley's anger at Plaintiff for having "blown the

whistle" on Scalley's new illegal "drive time" policy.  While neither Scalley nor LaFrance have

admitted that Scalley told LaFrance to "build a file and get rid of Bill Mike," the trier of fact

reasonably could draw that inference.  As noted above, plaintiffs in employment discrimination

15

cases usually must rely on such evidence, because employers generally do not expressly state their discriminatory or retaliatory motivation. *Rosen v. Thornburgh*, 928 F.2d at 533.

In order to establish causation in a case of alleged retaliation, a plaintiff must show that the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent. *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002). The causal connection needed to prove a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action. *Id.*; *Feingold v. New York*, 366 F.3d 138, 156-57 (2d Cir. 2004); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir. 2001); *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988).

For example, in *Williams v. Pharmacia, Inc.*, 137 F.3d 944 (7th Cir. 1998), the plaintiff alleged that she was terminated five months after filing a grievance regarding a salary differential between men and women, and three months after she filed a discrimination claim with the Equal Employment Opportunity Commission. 137 F.3d at 949. The plaintiff first began complaining of this differential in January, 1994; in March, she received her January performance review that imposed onerous and arguably unachievable objectives. *Id.* In August, when she could not meet these unreasonable objectives, she was terminated. *Id.* As noted by the District Court:

> In Ms. Williams' theory of the case, her discharge was not an isolated and spontaneous event. She alleged, and . . . presented sufficient evidence to support, that Pharmacia set unattainable goals to set up her termination. The evidence viewed in the light most favorable to Ms. Williams showed that between her performance review in March and her termination in August, Ms. Williams was subjected to closer scrutiny than male salespeople, and to performance requirements that similarly situated male salespeople were not required to meet. In this way, Ms. Williams' termination occurred over a period of several months,

16

and her discrimination claim [to the EEOC} came squarely in the middle of this process. The jury reasonably could view her May 1994 claim as a factor in contributing to the treatment Ms. Williams received after her review, which in turn led to her termination in August.

*Williams v. Pharmacia, Inc.*, 956 F. Supp. 1457, 1464 (N.D. Ind. 1996), affirmed, 137 F.3d 944 (7th Cir. 1998).

Likewise, in this case Plaintiff has presented evidence showing that the retaliation against him began almost immediately after he informed Scalley on August 2, 2002 of his report to the Department of Labor. Plaintiff has presented evidence showing that he was subjected to onerous and unattainable objectives, by having his hours cut and his requirements for tasks and miles driven increased. Plaintiff was the only PD Rep subjected to such "Performance Objectives" and "Action Plans." The evidence shows that this retaliation culminated in his termination a mere four months later. A reasonable jury may infer that, by changing the conditions of Plaintiff's employment and subjecting him to these onerous and unobtainable objectives, Scalley intentionally "set him up for failure" in order to manufacture a reason terminate him. Retaliatory intent may be found in all of these actions. This evidence more than meets Plaintiff's "*de minimis*" burden of showing the existence of a disputed material fact that defeats summary judgment. Accordingly, Defendant's Motion for Summary Judgment should be denied.

> C.    *There are Material Questions of Fact Regarding Whether Defendant's Stated Reasons for Plaintiff's Termination are Pretextual*

Defendant next argues that summary judgment should enter because there is no evidence that Safeco's proffered reason for Plaintiff's termination, poor performance between August 2, 2002 and December 2, 2002, is a pretext for retaliation. This argument fails for the same reason that Defendant's causation argument fails: because Plaintiff has presented sufficient evidence

17

both to establish a prima facie case that he was being retaliated against, and that Safeco's claim of poor job performance is false and pretextual. Under the standard set forth in ***Reeves v. Sanderson Plumbing Products, Inc.***, 530 U.S. 133, 147-48, 120 S.Ct. 2097, 2108-09, 147 L.Ed.2d 105 (2000), this is sufficient to allow the trier of fact to conclude that Safeco unlawfully retaliated against him, thus precluding summary judgment.

Defendant claims that "Plaintiff's performance deficiencies were well documented and he was given several opportunities to improve his performance prior to his discharge." Defendant's Memorandum of Law at 19. As noted above, however, Plaintiff has produced evidence that *none of these "performance deficiencies" began until immediately after the August 2, 2002 meeting.* A plaintiff may establish pretext, sufficient to defeat a summary judgment motion, by showing a strong temporal correlation between the protected conduct and the retaliation, such as by showing that almost all of the evidence supporting the asserted non-retaliatory reason for discharge was created by the alleged wrongdoers and followed the protected conduct. ***Quinn v. Green Tree Credit Corp.***, 159 F.3d 759, 770 (2d Cir. 1998). That is precisely what the evidence shows in this case.

Almost all of the evidence before this Court shows that Plaintiff's performance was not an issue prior to August 2, 2002. Plaintiff received a good performance review on April 19, 2002, in which he was commended for his "professionalism, patience, sensitivity and tact;" for being a "team player;" and for "tak[ing] the time to do proper claim research." (See Exhibit B) Plaintiff had never been disciplined or written up. (See Exhibit A at ¶ 6). All of the "performance deficiencies" relied upon by Defendant are a direct result of the retaliation that began immediately after Plaintiff's report to the Department of Labor.

18

Indeed, the only so-called "performance deficiencies" prior to the August 2, 2002 meeting are two alleged "complaints" about Plaintiff's demeanor (without no supporting details) – one involving some undefined and undescribed "dispute" between Plaintiff and David Kabara, his then-supervisor, and one involving alleged rudeness by Plaintiff when communicating with Human Resources in late-June/early-July 2002, while he was out of work and receiving Workers' Compensation benefits.[3]  (See Exhibit H at 25-28).  Two vague, indefinite and undocumented complaints of alleged "hostility" by Plaintiff certainly do not constitute "well-documented" deficiencies in Plaintiff's performance, and cannot overcome the substantial evidence presented by Plaintiff.

All of the claimed "deficiencies" suddenly appeared after August 2, 2002.  Even then, however, when Mr. LaFrance had an opportunity directly to observe and assess Plaintiff's job performance, there were no problems or "deficiencies.  As noted above, when La France took the opportunity to "ride along" with Plaintiff to assess his job performance and address the supposed "deficiencies," Mr. LaFrance could not identify a single thing that Plaintiff was doing wrong. (See Exhibit E at 26-28; Exhibit F at 29-30).

Drawing the requisite inferences from this evidence in Plaintiff's favor, as the Court must do, there is sufficient evidence to show the existence of a material fact on the issue of pretext. Thus, summary judgment is not appropriate, and Defendant's Motion for Summary Judgment should be denied.

---

[3]Mr. Scalley could not pinpoint when the alleged complaint from Chris Stagis, referred to at page 5 of Defendant's Memorandum of Law, took place, other than that it was "some time before September of 2002.  See Exhibit H at 28.

D.     *Plaintiff's Wrongful Discharge Claim in Count Two is not Precluded by C.G.S.*
       *31-51m*

Defendant argues that summary judgment should enter on the Second Count of Plaintiff's

Complaint, because a common-law wrongful termination based upon violation of the public

policy against allowing employers to retaliate against employees who complain about violations

of the law.  This argument misconstrues the nature of the allegations in the Second Count.

Because the conduct alleged in the Second Count is not covered within the scope of Section 31-

51m, it is not precluded under ***Burnham v. Karl & Gelb, P.C.***, 252 Conn. 153 (2000) and

***Campbell v. Town of Plymouth***, 74 Conn. App. 67 (2002).  Accordingly, Defendant's Motion

for Summary Judgment should be denied as to the Second Count.

The gravamen of the Second Count may be found in Paragraph 20 of that Count:

> The Defendant's actions as set forth above constitute a wrongful discharge in
> violation of the public policy that *employees who in good faith complain that*
> *their employers have violated state statutes* should not be retaliated against.

(Emphasis added).

The First Count addresses Plaintiff's report to the Department of Labor; the Second

Count addresses Plaintiff's *internal* complaint to Mr. Scalley.  These are two different activities,

and thus two different claims.  A claim that an employee was retaliated against for complaining

to his supervisor about violations of the law supports a claim for wrongful discharge for

violation of public policy under ***Sheets v. Teddy's Frosted Foods, Inc.***, 179 Conn. 471 (1980),

and is not precluded by Section 31-51m.  ***Wolf v. Servco Oil, Inc.***, 1998 WL 638474 (Conn.

Super., Sept. 8, 1998) (copy attached as Exhibit R).  See also ***Clinton v. ITT Hartford***,1995 WL

264008 (Conn. Super. Apr. 26, 1995) (copy attached as Exhibit S) (internal complaint of illegal

and unethical behavior sufficient to support cause of action for wrongful termination in violation

of public policy); *Mirto v. Laidlaw Transit, Inc.*, 1993 WL 137627 (Conn.Super., Apr. 20, 1993) (copy attached as Exhibit T) (internal complaint of unscrupulous behavior and threat to contact public agency sufficient to support cause of action for wrongful termination in violation of public policy).  Thus, Plaintiff still has a remedy for retaliation based upon his complaint to Mr. Scalley that the proposed policy change was illegal, regardless of whether or not Mr. Scalley knew of his report to the Department of Labor.

The Complaint in this action initially was drafted for the Connecticut Superior Court, and adopts the common Superior Court practice of incorporating paragraphs from a prior count. Plaintiff thus understands Defendant's possible confusion regarding the Second Count.  Drawing all inferences in favor of Plaintiff, however, it is clear that the claim in the Second Count, while similar to that in the First Count, actually is based upon Plaintiff's internal complaint.  This claim is not precluded by Section 31-51m.  Accordingly, Defendant's Motion for Summary Judgment as to this Count should be denied.

## V.    CONCLUSION

Plaintiff has presented sufficient evidence from which the trier of fact may conclude that he engaged in protected activity when he reported the proposed illegal change in "drive time" policy to the Connecticut Department of Labor, and that he was retaliated against by Francis Scalley, acting himself and through Jeffrey LaFrance, for having done so.  Plaintiff also has presented sufficient evidence from which the trier of fact may conclude that Defendant's proffered non-retaliatory reason for his termination is a pretext, and that he was "set up for failure" in retaliation for having prevented Mr. Scalley from implementing the illegal policy change, either because of his report to the Department of Labor or because of his internal

complaint to Mr. Scalley.  Thus, material issues of fact exist that preclude the entry of summary

judgment.  Accordingly, Defendant's Motion for Summary Judgment should be denied.

PLAINTIFF,

By: _____
    Anthony J. Pantuso, III
    Hayber & Pantuso, LLC
    221 Main Street, Suite 400
    Hartford, CT 06106
    Juris No: 420475
    (860) 522-8888
    (860) 240-7945 (facsimile)

## **CERTIFICATION OF SERVICE**

This is to certify that a copy of the foregoing was mailed this date to all counsel and pro se parties of record, including:

Attorney Margaret Strange
Jackson, Lewis, LLP
55 Farmington Ave, Ste. 1200
Hartford CT 06105

_____
Anthony J. Pantuso, III