UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WILLIAM E. MIKE<br>　　　Plaintiff, | : : : : : | |
| v. | : : : | Civil No. 3:03CV0537 (DJS) |
| SAFECO INSURANCE COMPANY<br>OF AMERICA,<br>　　　Defendant. | : : : : | October 1, 2004 |

### PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT

1. Plaintiff commenced employment at Safeco on or about April 3, 2000 as a Field Representative in the Claims Department (Pl. Dep. I, p.28; Strange Aff., Ex.1.)

**ADMITTED that Plaintiff commenced employment with Safeco on or about April 3, 2000 in the position that variously has been identified as "Claims Field Representative – Physical Damage (PD) Rep," "Field Representative Auto," "Claims Field Representative" and "Claim Representative."  (Collectively, "PD Rep").  (See, e.g., Performance Reviews, Exhibits B, C and D).**

2. As a Field Representative, Plaintiff was responsible for investigating and handling automobile damage claims in the field.  Plaintiff "performed all aspects of auto damage claims...including...the photos, the documentation, the payments, the supplements, the phone calls, the problems." (Pl. Dep. I, p. 112.)

**ADMITTED that Plaintiff's primary responsibilities in his position of PD Rep were to inspect and appraise damaged automobiles (Mike Affidavit, Exhibit A, ¶ 5), which**

**included inspection, appraisal, photographs, payments, supplements, phone calls and problems.**

   3. When he was first hired, Plaintiff reported to Mike McCullough. After about one year, Dave Kabera became the unit manager and Plaintiff's immediate supervisor. (Pl. Dep. I, pp. 162-63.)

  **ADMITTED, although Plaintiff believes the proper spelling of his immediate supervisor's name is "Kabara."**

   4. On March 20, 2002, Fran Scalley was hired as Product Line Manager at Safeco and became Mr. Kabera's supervisor. (Scalley Dep., pp. 7-8.)

  **ADMITTED**

   5. Once Mr. Scalley was hired, Plaintiff's job demands became more difficult. Before Mr. Scalley became Product Line Manager, Plaintiff's "job was to do my inspections as thoroughly and efficiently, as quickly as I can, pay as little as I can, and reduce the cost in that matter." (Pl. Dep. II, p.49.)

  **ADMITTED that throughout his tenure with Safeco, Plaintiff's job was to do his inspections as thoroughly and efficiently as possible while working to keep costs and payments down.**

   6. Once Mr. Scalley was hired,

> The job became to include a lot more administrative-secretarial type work like that we had never done. He had us doing form letters, that I never sent out a letter in my life. And, unfortunately, all this stuff would have to be done by the time I leave my house, run around all day, get all the way back, do all my documentation and everything else that I would have to do, the over-and-above stuff.

(Pl. Dep. I, pp. 200-01.)

**ADMITTED that Mr. Scalley implemented a lot more administrative-secretarial type work prior to Plaintiff's termination on December 2, 2002.**

7. In July 2002, Mr. Scalley demoted Mr. Kabera to a Field Representative position and assumed Mr. Kabera's duties until a replacement could be found. In September 2002, Mr. Scalley, together with the human resources department, selected Jeff LaFrance to replace Mr. Kabera. (Scalley Dep., pp. 8-9; Pl. Dep. I, pp. 200-01.)

**ADMITTED that Mr. Scalley demoted Mr. Kabara in July, 2002 and acted as Plaintiff's immediate supervisor until the beginning of September, when he recruited Mr. LaFrance, with whom he had worked at Geico, for the position. (Mike Affidavit, Exhibit A, ¶ 33; LaFrance Deposition, Exhibit E at 10).**

8. From September 2002 until his termination on December 2, 2002, Plaintiff reported to Mr. LaFrance. (LaFrance Dep., pp. 6-7; Scalley Dep., pp. 9, 60.)

**ADMITTED that Mr. LaFrance was Plaintiff's immediate supervisor, and that Plaintiff reported to Mr. LaFrance, as well as Mr. Scalley, during this time period. (Mike Affidavit, Exhibit A, ¶¶ 33-36).**

9. While Mr. Scalley supervised Plaintiff between July 2002 and September 2002, he received several complaints about Plaintiff's communication style and his lack of professionalism. In one instance, a member of Safeco's human resources department complained to Mr. Scalley that Plaintiff had been hostile in processing a workers' compensation claim he submitted. (Scalley Dep., pp. 26-27.)

**UNKNOWN.  Plaintiff can neither admit nor deny this statement, as he has no knowledge of whether Mr. Scalley received any complaints and has no recollection of ever having been hostile in processing his worker's compensation claim.**

        10.    Mr. Scalley also received a complaint from Chris Stagis, an inside unit manager, about the hostile manner in which Plaintiff communicated with an inside claims representative.  (Scalley Dep., pp. 27-29.)  These complaints involved Plaintiff yelling, exhibiting an inappropriate demeanor and generally demonstrating a lack of professionalism in his communications.  (Scalley Dep., p. 38.)

**UNKNOWN.  Plaintiff can neither admit nor deny this statement, as he has no knowledge of whether Mr. Scalley received any complaints and has no recollection of ever having been hostile in communicating with Mr. Stagis.**

        11.    Mr. Scalley was also concerned about Plaintiff's job performance because Plaintiff worked "an enormous amount" of overtime which inflated the unit's costs and overall expenses.  (Scalley Dep., pp. 30.)  Plaintiff worked "a lot more" overtime than any other Field Representative.  (Scalley Dep., pp. 34, 49.)  Mr. Scalley discussed Plaintiff's excessive overtime with him almost every day and was concerned because Plaintiff's production did not reflect the amount of overtime he worked.  (Scalley Dep., pp. 29-32.)

**UNKNOWN as to what Mr. Scalley's concerns were.  DENIED that Plaintiff worked "an enormous amount" of overtime.  (Mike Affidavit, Exhibit A, ¶¶ 15, 32; pay stubs, Exhibit G; Scalley Deposition, Exhibit H at 34).  ADMITTED that, because of the very large size and rural character of his territory, Plaintiff worked more overtime on average than other PD Reps.  (Mike Affidavit, Exhibit A, ¶¶ 9-13; Mike Deposition,**

**Exhibit F at 21-27). ADMITTED that Mr. Scalley frequently discussed Plaintiff's overtime after August 2, 2002, and occasionally before that date. (Mike Affidavit, Exhibit A, ¶¶ 18, 31, 36). DENIED that Plaintiff's production did not reflect the amount of overtime he worked. (Mike Affidavit, Exhibit A, ¶¶ 6, 9-15; 4/19/1002 Performance Review, Exhibit B; Mike Deposition, Exhibit F at 27; Scalley Deposition, Exhibit H at 34).**

       12.    In September 2002, Jeff LaFrance was hired as unit manager to replace Mr. Kabera and became Plaintiff's immediate supervisor. (LaFrance Dep., p. 6; Scalley Dep., p. 60.)

    **ADMITTED.**

       13.    As unit manager, Mr. LaFrance monitored the work of 12 or 13 Field Representatives, reviewed their written estimates, conducted re-inspections of their work and handled scheduling issues. (LaFrance Dep., pp. 7-8.) He also monitored how many claims were assigned to each individual and made sure that the claims were evenly distributed. (LaFrance Dep., p. 11.)

    **ADMITTED.**

       14.    In evaluating Field Representatives under his supervision, Mr. LaFrance relied on the results of his re-inspections of their work, his file reviews and any complaints he received about them. (LaFrance Dep., p.14.)

    **ADMITTED that re-inspections, file reviews and complaints were among the criteria used to evaluate PD Reps, along with "hard numbers" such as non-OEM usage percentage, repair vs. replace percentage, turnaround time, claims volume and estimate overwrite. (LaFrance Deposition, Exhibit E at 14-15).**

15. Mr. LaFrance also considered the Field Representatives' efficiency in performing the requirements of the job. "[I]f they couldn't do their average amount of work in a regular time frame," then Mr. LaFrance took into account the amount of overtime a Field Representative worked. (LaFrance Dep., p. 17.)

**ADMITTED that Mr. LaFrance so testified at his deposition; UNKNOWN if this actually was taken into account in evaluating the performance of PD Reps.**

16. Once he began reporting to Mr. LaFrance, Plaintiff's job duties continued to become more demanding. His duties changed in that,

> [t]hey became more definitive [and] started to include four tasks per day. So those are four new inspections. If I am someplace and have to go to do a secondary supplemental reinspection for hidden damage, I take the time to do it, but its not even recognized as time per Jeff and Fran because all they say is mileage and tasks. So there is a lot of work that is entailed to do a claim that they do not account for in their stipulations of those two parameters.

(Pl. Dep. II, pp. 49-50.)

**ADMITTED that Mr. Scalley and Mr. LaFrance increased the number of new tasks he was to perform in a given day, without considering the extremely large and rural character of his territory, the amount of drive time required to cover his territory, their reduction in Plaintiff's average work day, the substantial time necessary to perform supplements, reinspections and documentation or counting them towards the tasks performed in a given day, and the fact that the nature of his territory required Plaintiff to do more work than other PD Reps. (Mike Affidavit, Exhibit A, ¶¶ 9-13, 43-46; Mike Deposition, Exhibit F at 22-27).**

17. Plaintiff further testified, "The format of doing the estimates changed drastically and it involved basically a lot more work to do these estimates and a lot of that was

implemented since Jeff and Fran came on board. So in essence to actually do our job and complete a claim involved quite a bit more work afterwards than prior to them coming because some of these issues they initiated." (Pl. Dep. II, pp. 22-23.)

**ADMITTED that Mr. Scalley and Mr. LaFrance increased the amount of work to be performed after Mr. LaFrance was hired in September, 2002, and that Plaintiff testified as set forth above.**

    18. Plaintiff testified, "[A] lot of what Jeff and Fran did basically was in effect was increase the amount of work that it took to complete a claim." (Pl. Dep. II, p.25.)

**ADMITTED that Mr. Scalley and Mr. LaFrance increased the amount of work to be performed after Mr. LaFrance was hired in September, 2002, and that Plaintiff testified as set forth above.**

    19. In reinspecting Plaintiff's work, Mr. LaFrance found,

> Physical re-inspections that would show writing parts that were not damaged, missing damage that was damaged, poor documentation on his estimates, meaning . . . not listing days to repair, not having the correct V-I-N number, vehicle identification number on the estimate, different items were missing or just not correct.

(LaFrance Dep., pp 18-19.)

**ADMITTED that Plaintiff's job performance began to suffer as an inevitable result of Mr. Scalley's and Mr. LaFrance's efforts to retaliate against Plaintiff by forcing him to work an approximately 50 hour per week job in 38.75 hours by refusing to authorize overtime that routinely had been authorized in the past, thus reducing his average work day, while imposing new, more onerous requirements on Plaintiff that were not imposed on his co-workers. (Mike Affidavit, Exhibit A, ¶¶ 15, 29-36, 40-54).**

7

20. Mr. LaFrance also found a "higher percentage of deviances" in Plaintiff's estimates than in those prepared by other Field Representatives. (LaFrance Dep., p. 20.)

**ADMITTED that Mr. LaFrance so testified; UNKNOWN as to the percentage of deviances in other PD Reps' estimates.**

21. Mr. LaFrance also received several complaints about Plaintiff's job performance. (LaFrance Dep., p.21.) The complaints concerned "[h]is demeanor on the job, not returning phone calls . . . on the estimates themselves, on the process he followed. So totaling the vehicle versus not totaling the vehicle - considering the vehicle totaled versus not totaling the vehicle without talking to the customer." (LaFrance Dep., p. 21.)

**ADMITTED that Mr. LaFrance so testified; UNKNOWN as to whether Mr. LaFrance received any such complaints.**

22. Mr. LaFrance discussed these issues with Plaintiff, but the more he talked to him about his performance, "it seemed the worse it got." (LaFrance Dep., p. 25.)

**ADMITTED that Mr. LaFrance discussed performance issues with Plaintiff. ADMITTED that Plaintiff's job performance began to suffer as an inevitable result of Mr. Scalley's and Mr. LaFrance's efforts to retaliate against Plaintiff by forcing him to work an approximately 50 hour per week job in 38.75 hours by refusing to authorize overtime that routinely had been authorized in the past, thus reducing his average work day, while imposing new, more onerous requirements on Plaintiff that were not imposed on his co-workers. (Mike Affidavit, Exhibit A, ¶¶ 15, 29-36, 40-54).**

23. Plaintiff also exhibited a consistent inability to get his job done within normal business hours. Plaintiff "didn't do the work . . . the average claim rep would do. He got

his 4 claims a day done but it involved excessive amounts of overtime." (LaFrance Dep., p. 52.) Mr. LaFrance estimated that Plaintiff worked four times the amount of overtime than any other Field Representative "to do the same amount of work." (LaFrance Dep., p. 52.)

**ADMITTED that, because of the very large size and rural character of his territory, Plaintiff worked more overtime on average than other PD Reps to do the same amount of work. (Mike Affidavit, Exhibit A, ¶¶ 9-13; Mike Deposition, Exhibit F at 21-27). DENIED that Plaintiff did not do the work that an average PD Rep would do. (Mike Affidavit, Exhibit A, ¶¶ 7, 9-13, 31-32, 35-39, 51-54; 4/19/2002 Performance Review, Exhibit B; 11/1/2001 Performance Review, Exhibit C; 1/8/2001 Performance Review, Exhibit D; Mike Deposition, Exhibit F at 21-27). ADMITTED that Mr. LaFrance testified that he estimated that Plaintiff worked four times the amount of overtime as any other PD Rep; UNKNOWN how much overtime actually was worked by other PD Reps.**

24. In October 2002, Mr. LaFrance prepared a document outlining Plaintiff's performance deficiencies and his expected improvement entitled "Performance Expectations." (LaFrance Dep., pp. 28-29; Strange Aff., Ex.2.) Mr. LaFrance "felt that there was a need for some kind of action with Mr. Mike, to get him on the right track, to make him do his job the correct way." (LaFrance Dep., p. 30.)

**ADMITTED that Mr. LaFrance prepared the "Performance Expectations" document. UNKNOWN what Mr. LaFrance felt.**

25. Mr. LaFrance met with Plaintiff on October 7, 2002 and discussed the items listed on the document. (Pl. Dep. II, pp. 17-18.) In the document, Mr. LaFrance outlined his concerns about Plaintiff's performance in five categories: 1) his failure to contact new assignments

9

within 72 business hours; 2) his failure to properly document files after completing his inspections; 3) his failure to prepare complete and accurate estimates; 4) his failure to complete an average of four new tasks within normal work hours; and 5) his failure to show professional courtesy in dealing with co-workers and customers.  (LaFrance Dep., pp. 31-43; Strange Aff., Ex.2.)  Plaintiff reviewed the document with Mr. LaFrance and made a copy for himself.  (LaFrance Dep., p. 44.)

**ADMITTED that Plaintiff met with Mr. LaFrance on October 7, 2002 to discuss the "Performance Expectations" document, which speaks for itself.  ADMITTED that Plaintiff received a copy of the document.**

26.   In late October 2002, after Plaintiff's performance failed to improve, Mr. LaFrance "went ahead and drew up an action plan, which was a 30-day plan."  (LaFrance Dep., p. 49; Strange Aff., Ex.3.)

**ADMITTED that Plaintiff was presented with an "Action Plan" on or about October 28, 2002.  ADMITTED that Plaintiff's job performance suffered as an inevitable result of Mr. Scalley's and Mr. LaFrance's efforts to retaliate against Plaintiff by forcing him to work an approximately 50 hour per week job in 38.75 hours by refusing to authorize overtime that routinely had been authorized in the past, thus reducing his average work day, while imposing new, more onerous requirements on Plaintiff that were not imposed on his co-workers.  (Mike Affidavit, Exhibit A, ¶¶ 15, 29-36, 40-54).**

27.   On October 30, 2002, Mr. LaFrance met with Plaintiff to discuss the issues outlined in the Action Plan.  (LaFrance Dep., p. 49; Strange Aff., Ex.3.)  Mr. LaFrance expressed many of the same concerns regarding Plaintiff's failure to: 1) contact new assignments within 72

hours; 2) document his tasks including inspection delays, supplements and owner contacts; 3) follow procedure in preparing estimates; 4) complete an average of four new tasks per day within normal business hours; 4) follow company procedure by obtaining re-approval for overtime; and 5) communicate with staff and customers in a professional manner. (LaFrance Dep., p. 49; Strange Aff., Ex.3.)

**ADMITTED that Plaintiff met with Mr. LaFrance in late October, 2002 to discuss the "Action Plan" document, which speaks for itself, although Plaintiff believes this meeting took place on or about October 28, 2002. (Mike Affidavit, Exhibit A, ¶ 48). ADMITTED that Plaintiff received a copy of the document.**

28.     Mr. LaFrance explained to Plaintiff that he needed to improve in these areas and that if he failed to do so, it could lead to his discharge. (LaFrance Dep., pp. 50-51; Strange Aff., Ex.3.) Plaintiff responded that he believed his job had changed, that the standards were difficult to achieve and that he would do his job to the best of his ability. (Strange Aff., Ex.3; Pl. Dep. II, p.85; LaFrance Dep., p.51.) Plaintiff understood that if he did not improve his job performance, he could be terminated. (Pl. Dep. II, p. 86.)

**ADMITTED that Mr. LaFrance threatened Plaintiff with termination if he was unable to meet the new, more onerous requirements that Mr. Scalley and Mr. LaFrance had imposed on Plaintiff that were not imposed on his co-workers, without working any overtime, as had been customary and permitted in the past. (Mike Affidavit, Exhibit A, ¶¶ 15, 29-36, 40-54).**

29.     After placing Plaintiff on the Action Plan, Mr. LaFrance continued to monitor his performance. Plaintiff "started documenting a little bit better but he was still

11

argumentative as far as doing the job [and] always had a reason why he couldn't do the job." (LaFrance Dep., pp. 51-52.) Mr. LaFrance concluded that Plaintiff's job performance did not improve in any other way. (LaFrance Dep., p. 53.)

**ADMITTED that Mr. LaFrance continued to monitor Plaintiff's job performance. ADMITTED that Plaintiff's job performance improved. DENIED that Plaintiff was argumentative and always had a reason why he couldn't do the job. UNKNOWN what Mr. LaFrance concluded.**

30.     Mr. LaFrance met with Plaintiff on November 25, 2002 to review his job performance and follow-up on the points outlined in the Action Plan. At the meeting, one of the items they discussed was Plaintiff's failure to use non-OEM parts on vehicles. Based on their discussion, Mr. LaFrance believed that Plaintiff exhibited "a complete refusal to work with us, refusal to even try to improve on his part." (LaFrance Dep., p. 55) Plaintiff also became quite loud and agitated during the meeting. He repeatedly called Mr. LaFrance a liar and told him he was full of shit. Plaintiff screamed and pounded on the desk so loudly that Ms. Kiernan had to interrupt the meeting to ask him to quiet down because he was disturbing the rest of the office. (LaFrance Dep. p.57.)

**ADMITTED that Mr. LaFrance met with Plaintiff on November 25, 2002. Admitted that the use of non-OEM parts was discussed. UNKNOWN what Mr. LaFrance believed. ADMITTED that Plaintiff became upset during this meeting, as a result of the continuing and ongoing retaliation against him. ADMITTED that Plaintiff called Mr. LaFrance a liar and "full of shit." DENIED that Plaintiff screamed and pounded on the desk during this meeting.**

31. On December 2, 2002, after Plaintiff completed the thirty day period outlined in the Action Plan, Mr. LaFrance terminated his employment. On that date, Mr. LaFrance met with Plaintiff, reviewed the Action Plan and Plaintiff's deficient job performance and notified him that he was discharged. (LaFrance Dep., pp. 55-58.)

**ADMITTED that Plaintiff was terminated at a meeting on December 2, 2002.**

32. In documenting Plaintiff's discharge, Mr. LaFrance wrote, "Failure to follow or show improvement on 30 day action plan...Refusal to follow company guidelines in writing estimates. Poor decision making. Poor communication. Poor professionalism." (Strange Aff., Ex.4.)

**ADMITTED that this is what Mr. LaFrance wrote.**

33. On July 31, 2002, prior to the hire of Mr. LaFrance, Mr. Scalley issued an email to Plaintiff and his co-workers in which he addressed the issue of whether commute time was compensable as part of the Field Representative's normal job duties. There was some confusion regarding the issue and it was Mr. Scalley's understanding that Field Representatives' initial commute time from their house to their first assignment was not counted toward their usual work day for overtime purposes. (Scalley Dep., pp. 43-45; Strange Aff., Ex. 5.)

**ADMITTED that Mr. Scalley sent an e-mail informing PD Reps that they no longer would be paid for their first drive of the day. (Mike Affidavit, Exhibit A, ¶ 19; 7/31/2002 e-mail, Exhibit I). DENIED that there was any confusion, as PD Reps had been paid for the first drive of the day before this time. (Mike Affidavit, Exhibit A, ¶ 19). UNKNOWN what Mr. Scalley's understanding was.**

34. Mr. Scalley invited anyone with any questions regarding his understanding of drive time to meet with him at his office on August 2, 2002. (Scalley Dep., p. 46; Strange Aff,. Ex.5.)

**ADMITTED.**

35. Prior to August 2, 2002, Plaintiff contacted the Connecticut Department of Labor ("DOL") and "questioned" whether Field Representatives' initial drive time was compensable. (Pl. Dep. I, p. 15.) Plaintiff spoke to Peter Fracasso at the DOL who informed him that Field Representatives' initial drive time was compensable and counted toward their normal work hours. (Pl. Dep. I, pp. 13-16.)

**ADMITTED that Plaintiff contacted Peter Fracasso at the Connecticut Department of Labor to report the proposed change in policy and question whether or not he was correct in his belief that it was illegal. (Mike Affidavit, Exhibit A, ¶¶ 20-22; handwritten notes, Exhibit J). ADMITTED that Mr. Fracasso told Plaintiff that the proposed change in policy was illegal. (Mike Affidavit, Exhibit A, ¶ 23; Mike Deposition, Exhibit F at 14-16).**

36. In contacting the DOL, Plaintiff sought general information about the rules governing drive time. He did not file a complaint against Safeco with the DOL or any other agency. (Pl. Dep. I, pp. 16-31.)

**ADMITTED that Plaintiff in reporting this proposed change in policy, sought information because he believed it was illegal, and that Plaintiff did not file a complaint, because the policy never was instituted. (Mike Affidavit, Exhibit A, ¶¶ 20-22; handwritten notes, Exhibit J; Mike Deposition, Exhibit F at 14-16).**

37. The DOL does not have any record that Plaintiff contacted the agency or that he spoke to Mr. Fracasso regarding his employment with Safeco. (Strange Aff., Ex.6.)

**UNKNOWN.**

38. Plaintiff attended the meeting with Mr. Scalley on August 2, 2002. He was the only Field Representative who attended the meeting. Caryn Kiernan of Safeco's human resources department also attended the meeting. (Pl. Dep .I, pp. 17-19; Scalley Dep., p.47.) At the meeting, Mr. Scalley reiterated his understanding that Field Representatives' initial drive time was not compensable. Plaintiff told Mr. Scalley and Ms. Kiernan that he had contacted the DOL and been informed that Field Representatives were entitled to compensation for such time. Plaintiff gave them Mr. Fracasso's name and phone number and asked them to further investigate the matter. (Pl. Dep. I, p.18; Pl. Dep. II, pp. 78-80.)

**ADMITTED that Plaintiff was the only Field Representative who attended the meeting on August 2, 2002 with Mr. Scalley and Caryn Kiernan of Safeco's human resources department also attended the meeting. ADMITTED that Mr. Scalley reiterated his intention to implement the new drive-time policy that PD Reps would not be paid for their initial drive time. ADMITTED that Plaintiff informed Mr. Scalley that he had contacted the Department of Labor, and that the proposed change in policy was illegal. (Mike Affidavit, Exhibit A, ¶ 26). ADMITTED that Plaintiff gave Mr. Scalley Mr. Fracasso's name and telephone number.**

39. Shortly after his meeting with Plaintiff, Mr. Scalley learned, after further investigation by Ms. Kiernan, that Field Representatives' initial drive time was compensable. (Scalley Dep., pp. 54-55.)

**DENIED that Mr. Scalley learned, after further investigation by Ms. Kiernan, that PD Reps' initial drive time was compensable. Mr. Scalley first learned of this when he was informed by Plaintiff at the August 2, 2002 meeting that the proposed change in the drive time policy was illegal. (Mike Affidavit, Exhibit A, ¶ 26; Scalley Deposition, Exhibit H at 48-49; Mike Deposition, Exhibit F at 17-18).**

40. On August 6, 2002, Mr. Scalley issued an email to the Field Representatives in which he clarified that initial drive time was compensable and that "[y]our day begins when you leave the house not as previously defined through my earlier conversations...I apologize for the confusion this has created." (Scalley Dep., pp. 55-56; Strange Aff., Ex.7.)

**ADMITTED.**

41. As a result, Safeco's policy of compensating initial drive time never changed. (Pl. Dep. I, pp. 18-19; Pl. Dep. II, pp.76-77.) Plaintiff was always compensated for his initial drive time. (Pl. Dep. I, pp. 205-06.)

**ADMITTED.**

42. At the time he terminated Plaintiff's employment, Mr. LaFrance had no knowledge of Plaintiff's alleged contact with the DOL in July 2002. (LaFrance Aff., ¶ 2.)

**UNKNOWN what knowledge Mr. LaFrance had or when he acquired such knowledge.**

43. Mr. Scalley never informed him that Plaintiff allegedly contacted the DOL to question Mr. Scalley's understanding of the compensability of Field Representatives' initial drive time. (LaFrance Aff., ¶ 3. ) Nor did Ms. Kiernan ever inform Mr. LaFrance of Plaintiff's alleged contact with the DOL. (LaFrance Aff., ¶ 3.)

**UNKNOWN whether Mr. Scalley or Ms. Kiernan ever informed Mr. LaFrance of Plaintiff's report to the Department of Labor, or if Mr. Scalley simply told Mr. LaFrance, in essence, to "build a file and get rid of" Plaintiff.**

44.     Plaintiff never informed Mr. LaFrance of his discussion with the DOL "because it was an issue with me and Fran and Caryn." (Pl. Dep. II, pp. 77-78; LaFrance Aff., ¶3;)

**ADMITTED.**

45.     Mr. LaFrance was never even aware that there had been a question regarding the compensability of drive time for Field Representatives prior to Plaintiff's termination (LaFrance Aff., ¶ 4.)

**UNKNOWN what Mr. LaFrance knew.**

### PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH IT IS CONTENDED THERE IS A GENUINE ISSUE TO BE TRIED

1.  Whether Plaintiff's territory was substantially larger than that of any other PD Rep in Connecticut? (Mike Affidavit, Exhibit A, ¶¶ 9-10; Mike Deposition, Exhibit F at 21).

2.  Whether the nature of Plaintiff's territory required him to perform more work than other PD Reps in Connecticut? (Mike Deposition, Exhibit F at 27).

3.  Whether the nature of Plaintiff's territory required him to work more than 38.75 hours per week in order to adequately perform his job (Mike Affidavit, Exhibit A, ¶¶ 9-15; Mike Deposition, Exhibit F at 21-27).

4.  Whether Francis Scalley had any complaints with Plaintiff's job performance prior to August 2, 2002? (Scalley Deposition, Exhibit H at 29-34, 65-68).

5. Whether Plaintiff reported the proposed change in the "drive time" policy to the Connecticut Department of Labor because he thought it was illegal? (Mike Affidavit, Exhibit A, ¶¶ 20-21; Mike Deposition, Exhibit F at 14-16).

6. Whether Plaintiff informed Mr. Scalley at the August 2, 2002 meeting that the Connecticut Department of Labor had informed him that the proposed change in the "drive time" policy was illegal? (Mike Affidavit, Exhibit A, ¶ 26; Scalley Deposition, Exhibit H at 48-49).

7. Whether Francis Scalley's treatment of Plaintiff changed dramatically after the August 2, 2002 meeting? (Mike Affidavit, Exhibit A, ¶ 22; Mike Deposition, Exhibit F at 20-27; 8/16/2002 Memorandum, Exhibit L).

8. Whether Francis Scalley cut the amount of overtime authorized for Plaintiff in retaliation for having contacted the Department of Labor about the proposed illegal change of the "drive time" policy and preventing Scalley from implementing the illegal change in policy? (Mike Affidavit, Exhibit A, ¶¶ 29, 31, 32; overtime request e-mails, Exhibit M).

9. Whether any changes in Plaintiff's job performance after August 2, 2002 were caused by the refusal of Francis Scalley and Jeffrey LaFrance to authorize the overtime necessary to adequately perform his job, given the size and nature of his territory? (Mike Affidavit, Exhibit A, ¶¶ 29-36; 40-41).

10. Whether Francis Scalley and Jeffrey LaFrance increased the number of tasks to be performed by Plaintiff while decreasing the amount of time authorized to perform his job? (Mike Affidavit, Exhibit A, ¶¶ 42-53; 10/7/2002 Performance Expectations, Exhibit N; 10/28/2002 Action Plan, Exhibit O; 10/7/2002 e-mail, Exhibit P).

11. Whether the reason that Francis Scalley and Jeffrey LaFrance increased the number of tasks to be performed by Plaintiff while decreasing the amount of time authorized to perform his job was in retaliation for having contacted the Department of Labor about the proposed illegal change of the "drive time" policy and preventing Scalley from implementing the illegal change in policy? (Mike Affidavit, Exhibit A, ¶¶ 29, 31-32, 42-54).

12. Whether the facts that Plaintiff contacted the Department of Labor about the proposed illegal change of the "drive time" policy and complained of the proposed change at the August 2, 2002 meeting, thus preventing Francis Scalley from implementing the illegal change in policy, was the motivating factor in the actions that were taken against Plaintiff by Scalley and Jeffrey LaFrance after August 2, 2002, including Plaintiff's termination on December 2, 2002? (Mike Affidavit, Exhibit A, ¶¶ 29-54; 8/16/2002 Memorandum, Exhibit L; overtime request e-mails, Exhibit M; 10/7/2002 Performance Expectations, Exhibit N; 10/28/2002 Action Plan, Exhibit O; 10/7/2002 e-mail, Exhibit P).

                    PLAINTIFF,

                    By: _____
                          Anthony J. Pantuso, III
                          Hayber & Pantuso, LLC
                          221 Main Street, Suite 400
                          Hartford, CT 06106
                          Juris No: 420475
                          (860) 522-8888
                          (860) 240-7945 (facsimile)

## **CERTIFICATION OF SERVICE**

      This is to certify that a copy of the foregoing was mailed this date to all counsel and pro se parties of record, including:

Attorney Margaret Strange
Jackson, Lewis, LLP
55 Farmington Ave, Ste. 1200
Hartford CT 06105

                                            _____
                                            Anthony J. Pantuso, III